# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45396-7-II |
| Respondent, | |
| v. | |
| MATTHEW CHRISTOPER CHERRY, | PART PUBLISHED OPINION |
| Appellant. | |

LEE, J. — Matthew Christopher Cherry appeals his convictions and sentence for unlawful possession of a controlled substance and tampering with evidence, arguing that (1) the trial court's findings of fact supporting the trial court's suppression rulings are inaccurate; (2) the trial court erred in admitting his post-arrest statements and the methamphetamine pipe found in his car; (3) the trial court erred in finding his consent to a car search was freely and voluntarily given; (4) the trial judge lacked authority to sign the CrR 3.6 findings; (5) the trial court erred in failing to grant his requests for a new attorney; and (6) the trial court erred in imposing discretionary legal financial obligations.

In the published portion of our opinion, we hold that (1) any inaccuracies in the challenged findings were harmless; (2) Cherry's post-arrest statements, including his consent to the search of his car, did not violate his right to remain silent; and (3) Cherry's consent to the search was

voluntary. In the unpublished portion of our opinion, we address the remainder of Cherry's

arguments and hold that (4) any error in the successor judge's signing of the CrR 3.6 findings was

harmless; (5) the record does not show that Cherry had a conflict with his attorney sufficient to

warrant the appointment of new counsel; and (6) because Cherry challenges his legal financial

obligations for the first time on appeal, we decline to consider the challenge. Accordingly, we

affirm Cherry's convictions and sentence.

FACTS

After Cherry was arrested for driving with a suspended license, he consented to a search of

his car. A pipe containing methamphetamine residue was found. When Cherry was booked into

jail, he resisted a strip search and apparently swallowed the contents of a small pouch after it was

seen between his legs. The State charged Cherry by amended information with unlawful

possession of a controlled substance and tampering with evidence.

Cherry filed a CrR 3.6 motion to suppress the evidence found in his car, arguing that the

officers threatened to have his car impounded if he did not consent to its search and that his consent

was coerced. The trial court also conducted a CrR 3.5 hearing in which Cherry challenged the

admission of his post-arrest statements.

CrR 3.6 Hearing

Judge Steven Dixon presided over the CrR3.6 hearing. During the CrR 3.6 hearing,

Bremerton Police Officer Steven Forbragd, Officer Dale Roessel, and Cherry testified. Forbragd

testified that he was on patrol when he saw Cherry driving down the street. Forbragd also testified

that he had previously engaged in "countless" contacts with Cherry, including one at a hotel two

days earlier, and that he signaled for Cherry to stop because he knew that Cherry's driver's license

was suspended. Verbatim Report of Proceedings (VRP) (July 31, 2013) at 5. After Cherry stopped, Forbragd arrested him for driving with a suspended license, put him in the patrol car, and advised him of his *Miranda* rights.[1] Cherry stated that he did not want to make any statements.

When Forbragd asked Cherry to confirm who was in the car, Cherry identified his two passengers. When asked whether either passenger could take the car, Cherry responded that neither had a license and that he did not know anyone who did. Forbragd then informed Cherry that his car would be impounded for security purposes.

After the passengers left the scene, Forbragd asked Cherry if he would consent to a search of his car. Forbragd told Cherry that he did not have to consent, and Cherry replied that he did not want to consent. Cherry added that there were no drugs in the car because he had used them earlier, and he laughed.

Based on that comment and his knowledge of Cherry's drug history, Forbragd called for an officer to bring a drug dog to the scene and so informed Cherry. While they were waiting for Roessel and his K-9 unit to arrive, Cherry told Forbragd that he could search the car. Forbragd asked Cherry to confirm his consent and told him that he could revoke it at any time. Forbragd denied telling Cherry that he would not impound the car if Cherry consented to its search.

Roessel arrived and confirmed with Cherry that he was consenting to a search of his car. Roessel testified that he informed Cherry that he did not have to consent and that he could revoke consent at any time. Roessel also told Cherry that his consent to the search would not influence the decision to impound his car.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

During the search, Cherry told Forbragd that there might be a methamphetamine pipe in the car. When the search revealed a methamphetamine pipe in a backpack, Cherry admitted ownership of both. Forbragd testified that he ultimately decided against impounding the car because of Cherry's cooperation and because the car was not parked illegally.

Cherry testified that after his arrest, Forbragd told him that if he was truthful, his car would not be impounded. Cherry understood that to mean that if he was completely cooperative, his car would not be towed. Cherry denied that Forbragd told him he could refuse to consent to the search and testified that he consented only after Forbragd threatened impoundment. Cherry added that two days earlier, he had slammed his hotel door in Forbragd's face because the officer was invading his privacy. On cross-examination, Cherry admitted that he had multiple prior convictions for theft and one for making a false statement to a public officer. He estimated that he had 30 prior contacts with Bremerton police.

In his oral ruling, Judge Steven Dixon resolved the conflict between the officers' and Cherry's testimony in the officers' favor. Judge Dixon found no basis to believe that the officers threatened to impound the vehicle unless Cherry consented to its search. Judge Dixon further found that the officers twice told Cherry he did not have to consent and observed that Cherry's prior extensive contact with Bremerton police and his behavior during the arrest belied his testimony that he felt threatened. Judge Dixon noted that even if the officers told Cherry that they would not impound his car if he was truthful, this statement did not require him to be completely cooperative. Furthermore, even if the officers did threaten to impound the car if Cherry did not consent, Cherry's "criminal sophistication" was such that the threat was not coercive. VRP (July 31, 2013) at 66. Judge Dixon concluded that Cherry's consent to search was freely and voluntarily

4

given. Judge Dixon denied the motion to suppress and requested that the parties submit written findings of fact and conclusions of law.

### CrR 3.5 Hearing

Judge Anna Laurie presided over the CrR 3.5 hearing. Officer Forbragd again testified about Cherry's stop and arrest, and Cherry's statement that he did not want to make any comments after being informed of his *Miranda* rights. Forbragd added that after dealing with Cherry's passengers, he asked Cherry for consent to search his car. Cherry declined to consent and said that there were no drugs in the car because he had used them earlier.

Forbragd testified further that after Cherry changed his mind and consented to the search, he again spoke of smoking methamphetamine earlier that day and said that there might be a methamphetamine pipe in the car. Forbragd then asked Cherry if he was willing to talk, and Cherry said that he was. Forbragd testified that he never made any promises or threats to induce Cherry's statements and that Cherry never requested an attorney.

Cherry testified that the officers threatened to tow his car if he did not talk to them, that he never admitted using drugs earlier in the day, and that he requested an attorney when he received the *Miranda* warnings. On cross-examination, he acknowledged that he had 13 prior convictions for crimes of dishonesty.

In her oral ruling, Judge Laurie stated that "consistent with but independent of Judge Dixon's rulings that I also find the defendant's belief that there was [a] threat causing him duress to be less than credible." 1 VRP at 60. Judge Laurie found that Cherry volunteered the statements

5

about the absence of drugs in the car and about using methamphetamine earlier in the day and concluded that all of Cherry's statements were admissible.[2]

## Trial and Sentencing

At trial, a jury found Cherry guilty as charged. The State requested consecutive sentences totaling 18 months' incarceration, and defense counsel requested a low-end sentence of 6 months and concurrent sentencing. The trial court imposed 9 months on the possession conviction and a concurrent sentence of 364 days on the tampering conviction, with 184 days suspended.

Cherry appeals.

## ANALYSIS

A.      STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence to determine whether substantial evidence supports the trial court's findings of fact and whether those findings, in turn, support the trial court's conclusions of law. *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014). Unchallenged findings of fact are verities on appeal. *State v. Bonds*, 174 Wn. App. 553, 562, 299 P.3d 663, *review denied*, 178 Wn.2d 1011 (2013). We review a trial court's legal conclusions de novo. *State v. Roden*, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014).

Most of the trial court's written findings of fact are unchallenged and are thus verities. Cherry challenges the accuracy of a few CrR 3.5 and 3.6 findings, and we address those challenges before proceeding to a de novo review of the trial court's legal conclusions.

---

[2] The defense did not object to the admission of statements that Cherry made during the jail booking process.

No. 45396-7-II

B.    CHALLENGED FINDINGS OF FACT

We review challenged findings of fact to determine whether they are supported by substantial evidence, which is evidence sufficient to persuade a fair-minded, rational person of their truth. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). However, most of Cherry's challenges address omissions in the findings rather than their factual support.[3]

1.    CrR 3.6 Findings

Cherry challenges finding of fact IV, which states as follows:

> That the defendant had contact with [Officer Forbragd] a couple of days prior and in that contact, the Officer had asked to come in to his hotel room and search for drugs, which the defendant refused and slammed the door shut on the Officers.

Clerk's Papers (CP) at 78. Cherry faults this finding because it does not mention his comments after he invoked his right to remain silent and before he consented to the search. But this finding describes a prior incident between Cherry and Forbragd. Other unchallenged findings describe the discussion between Cherry and Forbragd following his arrest. This challenge fails.

Cherry next challenges finding of fact VII, which states:

> That while Officer Roessel was searching the defendant's vehicle, Officer Forbragd stayed inside the patrol car with the defendant in a place where the defendant could watch the search in case the defendant chose to revoke his consent. The defendant never revoked his consent and gave further consent to search the trunk of the vehicle.

CP at 78. Cherry argues that this finding neglects to mention the coercive atmosphere and Cherry's desire to avoid impound. Cherry does not challenge the facts included in this finding. Therefore,

---

[3] Cherry also assigns error to two conclusions of law on the basis that they are actually findings of fact that are unsupported by substantial evidence. We do not address these assignments of error because they are not supported by argument. RAP 10.3(a)(6); *State v. Goodman*, 150 Wn.2d 774, 782, 83 P.3d 410 (2004).

7

in the absence of any showing that this finding is not supported by substantial evidence, Cherry's challenge fails.

Finally, Cherry challenges finding of fact X on the ground that it refers to information that was not offered at the CrR 3.6 hearing. This finding states as follows:

> That the defendant was transported to the jail where the defendant was booked for several counts. Officer Forbragd later tested the pipe which did test positive for methamphetamine. The defendant has 53 prior misdemeanor convictions and 4 felony convictions.

CP at 79.

There was no testimony at the hearing about the number of offenses for which Cherry was booked, the testing of the pipe, or the fact that Cherry has 53 prior misdemeanors and 4 prior felonies. However, Cherry did testify during the CrR 3.6 hearing that he has 30 prior misdemeanors and 5 prior felonies. The number of Cherry's current or prior convictions, as well as the results of the field test, were irrelevant to the conclusion that his consent to search was voluntary; thus, any error in this finding is harmless.

2.      CrR 3.5 Findings

Cherry challenges two findings for failing to describe the questions that preceded his consent to search. They are as follows:

IV.

> That while Officer Forbragd was waiting for Officer Roessel to respond, the defendant changed his mind and told the Officer that he would give his permission for the Officer to search the vehicle. He again indicated that there was nothing left in the vehicle. This was not in response to another request by the Officer to search the vehicle.

V.

That Officer Roessel arrived on the scene and spoke with the defendant briefly to confirm that the defendant was giving his permission to search the vehicle. The defendant stated that he did give his consent for the search. The defendant was specifically told that he could refuse consent to search the vehicle.

CP at 74.

Here again, while not in these specific findings, other unchallenged findings include the exchanges between Officer Forbragd and Cherry that preceded his consent. Therefore, we reject this challenge.

Cherry also challenges finding of fact V and finding of fact VIII, complaining about the inclusion of Officer Roessel's statements before, during, and after the search even though the officer did not testify at the 3.5 hearing.[4] Roessel did not testify during the 3.5 hearing, and evidence of his statements to Cherry and the results of the car search was not admitted at that hearing. However, the issue at the 3.5 hearing was the voluntariness of Cherry's statements to Forbragd. Forbragd testified that he never made any threats or promises to induce Cherry's

---

[4] Finding of fact VIII provides as follows:

That Officer Roessel search [sic] the trunk and located a backpack with a photograph. The defendant admitted that the photograph was of his daughter. A methamphetamine pipe was also located in the same backpack. At first the defendant claimed that the backpack was not his but then admitted the backpack and the methamphetamine pipe both belonged to him. The Officers on scene determined that the vehicle was far enough off of the road way to leave at the scene and canceled the tow. The Officers never threatened the defendant that the vehicle would be towed if he did not give consent to search the vehicle.

CP at 75.

statements. The trial court's conclusion that Cherry's statements were admissible did not depend on Roessel's conduct or the search. Again, any error in this regard is harmless.

Having rejected Cherry's challenges to the findings of fact, we turn to a de novo review of the trial court's conclusions that Cherry's postarrest statements were admissible and that his consent to search was voluntary.

C.    RIGHT TO REMAIN SILENT

Cherry asserts that his post-arrest statements, including his consent to search, were inadmissible because they were obtained in violation of his constitutional right to remain silent. WASH. CONST. art. I, § 9: U.S. CONST. amend. V.[5] We disagree.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 439, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In *Miranda*, the United States Supreme Court adopted a set of measures designed to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. 384 U.S. at 467. These safeguards include a warning that the suspect has the right to remain silent. *Maryland v. Shatzer*, 559 U.S. 98, 104, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010).

The admissibility of statements obtained after a person in custody has decided to remain silent depends on whether his right to cut off questioning was scrupulously honored. *Michigan v.*

---

[5] The Washington Supreme Court has held that article I, section 9 is equivalent to the Fifth Amendment and should receive the same interpretation. *State v. Templeton*, 148 Wn.2d 193, 207-08, 59 P.3d 632 (2002). Consequently, we decline Cherry's invitation to apply a *Gunwall* analysis to determine whether the state constitution offers greater protection in this regard. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986) (setting forth factors to determine whether state constitution provides broader protection than federal constitution).

*Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (quoting *Miranda*, 384 U.S. at 474). The term "interrogation" under *Miranda* refers not only to express questioning by police but to words or actions that are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

1.      Questions About Passengers

Cherry complains that after he received *Miranda* warnings and invoked his right to remain silent, Officer Forbragd violated that right by asking questions about his passengers.   But, as the State points out, the questions about Cherry's passengers were not intended to and did not elicit incriminating information.  Rather, the questions were intended to determine whether Cherry's car could be safely removed from the scene.  *See State v. Wheeler*, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987) (asking routine questions during booking does not constitute unlawful interrogation because such questions rarely elicit an incriminating response).  The fact that there was no testimony about these preliminary questions during the CrR 3.5 hearing and no findings of fact addressing them supports our conclusion that they did not implicate Cherry's right to remain silent. *See State v. Williams*, 137 Wn.2d 746, 751, 975 P.2d 963 (1999) (purpose of CrR 3.5 hearing is to determine voluntariness of custodial statements).

2.      Request for Consent to Search

Cherry next argues that the officers were not permitted to ask for consent to search his car after he invoked his right to remain silent.  We disagree.

The State argues that an officer does not need to give *Miranda* warnings before asking for consent to search, and relies on cases holding that *Miranda* warnings are not required before asking for consent to search.  *See, e.g., State v. Silvernail*, 25 Wn. App. 185, 191, 605 P.2d 1279 (no

11

*Miranda* warnings needed before asking for keys after consent to search given because request "was not designed to elicit a testimonial response and Silvernail's unexpected voluntary admissions were not the product of police questioning"); *review denied*, 93 Wn.2d 1021, and *cert. denied*, 449 U.S. 843 (1980); *State v. Rodriguez*, 20 Wn. App. 876, 880, 582 P.2d 904 (1978) ("*Miranda* warnings are not a prerequisite to a voluntary consent . . . The fact that a consent to search might lead to incriminating evidence does not make it testimonial or communicative in the Fifth Amendment sense."). However, the cases relied on by the State do not address whether an officer can ask for consent to search after a defendant has invoked *Miranda* and his privilege against self-incrimination. No Washington case has addressed this specific issue.

Courts in other jurisdictions have held that once a defendant invokes the right to remain silent, a subsequent request for consent to search does not violate the defendant's Fifth Amendment rights. In *United States v. Hidalgo*, the court held that consent to search requested and obtained after defendant invoked his right to remain silent did not violate his Fifth Amendment rights because the Fifth Amendment protects only against compelling incriminating evidence of a testimonial nature and not against the compelled production of physical evidence. 7 F.3d 1566, 1568 (11th Cir. 1993). In so holding, the *Hidalgo* court rejected the premise that a consent to search is an incriminating statement and stated that "'[e]very federal circuit court which has addressed the *Miranda* issue presented here has reached the conclusion that a consent to search is not an incriminating statement.'" *Hidalgo*, 7 F.3d at 1568 (alteration in original) (quoting *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993); *see also Garcia v. State*, 979 So. 2d 1189, 1194 (Fla. Dist. Ct. App. 2008) (right to silence protects only testimonial or communicative acts of suspect, and consent to search is neither), *review denied*, 11 So. 3d 355

(2009); *State v. Crannell*, 170 Vt. 387, 392-93, 750 A.2d 1002 (2000) (request for consent to search does not violate Fifth Amendment rights, including right to remain silent), *overruled on other grounds by State v. Brillon*, 183 Vt. 475, 955 A.2d 1108 (2008), *rev'd and remanded*, 556 U.S. 81 (2009); *State v. Turner*, 136 Wis. 2d 333, 350-51, 401 N.W. 827 (1987) (requesting consent to search does not violate defendant's Fifth Amendment right to remain silent); and *State v. Baumeister*, 80 Or. App. 626, 628-29, 723 P.2d 1049 (asking for consent to search after defendant invoked right to remain silent does not violate Fifth Amendment), *review denied*, 302 Or. 299 (1986).[6]

The trial court found that Officer Forbragd informed Cherry of his *Miranda* rights before requesting Cherry's consent to search the car. The request for consent to search was not designed to elicit testimonial evidence and Cherry's consent was not an incriminating statement. Therefore, law enforcement did not violate Cherry's constitutional right to remain silent by requesting consent to search his car after Cherry had invoked that right.

3. Statements About Drugs

The only statements at issue during the CrR 3.5 hearing were Cherry's explanation, after initially declining to consent to a search, that there were no drugs in the car because he had used

---

[6] Other cases have applied the same rule when a defendant has requested an attorney. *See United States v. Bustamante*, 493 F.3d 879, 892 (7th Cir. 2007) (though interrogation must cease after a defendant in custody invokes his right to counsel, a request to search is not likely to elicit an incriminating response and is not interrogation; "*Miranda* does not protect a defendant who is in custody from a police officer's request to search his vehicle"), *cert. denied*, 552 U.S. 1237 (2008); *State v. Hatfield*, 246 Or. App. 736, 739, 743-44, 268 P.3d 654 (2011) (officer was not foreclosed from asking for consent to search after defendant invoked his right to counsel), *review denied*, 352 Or. 341 (2012); and *State v. Baldwin*, 290 S.W.3d 139, 144 (Mo. Ct. App. 2009) (Missouri courts have found that requesting consent to search after defendant requests counsel does not constitute interrogation because consent is not incriminating response).

13

them earlier and his subsequent statements during the search (after Cherry consented to a search) that he had smoked methamphetamine earlier and that there might be a pipe in his car. We hold that these statements were not made in response to any questioning in violation of Cherry's right to remain silent.

The trial court found:

> That . . . Officer Forbragd went back to the vehicle and asked [Cherry] for consent to search the vehicle. [Cherry] responded that he didn't want them to search his vehicle and that he had smoked all the drugs earlier in the day. [Cherry] then laughed.
>
> . . . .
>
> That [Cherry] made the comment, not in response to questioning, that there may be a pipe in the vehicle. [Cherry] stated that the pipe did not belong to him. Officer Forbragd asked [Cherry] if he wished to talk to the Officer. [Cherry] stated that everything he says usually gets used against him but that he would like to talk to the Officer.

CP at 74 (Findings of Fact III and VII.) . These unchallenged findings are verities on appeal. *Bonds*, 174 Wn. App. at 563.

Cherry's statements were not made in response to any questioning likely to elicit an incriminating response. Even if Cherry's statements were prompted by watching the police search his car, as Cherry now argues, they were not prompted by unlawful interrogation. We see no violation of Cherry's right to remain silent. Thus, Cherry's statements were properly admitted.

D.    CONSENT TO SEARCH

Cherry argues that his consent to search was not voluntary, and therefore, the search violated the Fourth Amendment and the evidence found during the search is inadmissible. We disagree.

Consent to search is an exception to the warrant requirement. *State v. Thompson*, 151 Wn.2d 793, 803, 92 P.3d 228 (2004). To show valid consent, the State must prove that the consent

was freely and voluntarily given. *State v. O'Neill*, 148 Wn.2d 564, 588, 62 P.3d 489 (2003). Whether consent was voluntary or the result of duress or coercion, express or implied, is a question of fact. *O'Neill*, 148 Wn.2d at 588. Factors used to determine whether a person has voluntarily consented include whether *Miranda* warnings were given, the individual's education and intelligence, and whether he was advised of the right to consent. *O'Neill*, 148 Wn.2d at 588.

The trial court found that Officer Forbragd read Cherry his *Miranda* rights before asking for consent to search his car, and that the officers informed Cherry that he had the right to refuse consent. The trial court also found that during his previous encounter with Forbragd at his hotel, Cherry had refused a search. In addition, the trial court found that the officers never threatened to tow the car if Cherry did not consent to its search. These unchallenged findings support the trial court's conclusion that the consent to search was voluntary.

Where officers tell a defendant they will impound his car and request a search warrant if he does not consent to its search, they are not being coercive. *State v. Smith*, 115 Wn.2d 775, 790, 801 P.2d 975 (1990). Furthermore, this is not a case where the officers misrepresented their authority in an attempt to obtain consent or stated that they would search the car with or without consent. *See Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968) (a search conducted in reliance on a warrant cannot later be justified on the basis of consent if the warrant was invalid); *State v. Apodaca*, 67 Wn. App. 736, 739-40, 839 P.2d 352 (1992) (threats to obtain a search warrant may invalidate subsequent consent if grounds for obtaining warrant did not exist), *overruled on other grounds by State v. Mierz*, 127 Wn.2d 460, 901 P.2d 286 (1995). As our Supreme Court stated in upholding another consensual search, "Bowing to events,

even if one is not happy with them, is not the same thing as being coerced." *State v. Lyons*, 76 Wn.2d 343, 346, 458 P.2d 30 (1969).

The trial court did not err in concluding that Cherry voluntarily consented to the search of his car. Consequently, we reject Cherry's argument that the fruits of that search, including the pipe and Cherry's admission of ownership, should have been suppressed.

We hold that the trial court did not violate Cherry's Fifth Amendment rights by admitting Cherry's statements made after he invoked his right to remain silent. We further hold that a request for consent to search the car after Cherry had invoked his *Miranda* rights did not violate Cherry's right to remain silent and that Cherry voluntarily consented to the search of his car. We also hold that Cherry's remaining arguments, addressed in the unpublished portion of this opinion, fail. Accordingly, we affirm Cherry's convictions.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

## ADDITIONAL FACTS

### Presentation of Findings

Judge Dixon presided over the CrR 3.6 hearing and made an oral ruling. Judge Laurie presided over the CrR 3.5 hearing, trial and sentencing. At sentencing, the State presented the CrR 3.6 and CrR 3.5 findings of fact and conclusions of law for the court's signature. When asked, Cherry's attorney did not object to Judge Laurie signing the agreed CrR 3.6 findings and

conclusions in Judge Dixon's absence.[7]  Defense counsel added that he had endorsed the CrR 3.5 findings and that they accurately memorialized the oral ruling.

Requests for New Counsel

Cherry asked for a new attorney several times before the trial began on September 10, 2013.  At an omnibus hearing on June 25, and after defense counsel informed the court that he had spoken to Cherry "at some length" about the search issues, Cherry informed the court that he would like his attorney to withdraw:  "I don't feel like he's representing me fully to my indigent defense.  And I don't need a warm body with a law degree—no disrespect—as my trial counselor."  VRP (June 25, 2013) at 3, 4-5.  The court denied Cherry's request because there was no evidence that his attorney could not competently represent him.

At a hearing on July 10, after defense counsel informed the court that he had been on vacation the previous week but was currently working on the CrR 3.6 brief, Cherry said that he needed to address the court about irreconcilable differences with his attorney.  Cherry complained that his attorney had not been to see him since the previous hearing and had said it would be best if he took the plea bargain.  When the court asked defense counsel if there was any reason that he could not represent Cherry, counsel responded no, and the court ordered him to remain on the case.

On August 26, Cherry gave the court a letter stating that he was dissatisfied because  his attorney (1) had told the court on July 10 that he had not yet reviewed the police report; (2) had violated the attorney/client privilege on more than one occasion; (3) was biased against him and believed he was guilty, (4) would not interview or investigate the State's expert witness; (5) would

---

[7] Judge Laurie explained that Judge Dixon would be on the bench in Grant County for more than two weeks.

not propose a lesser included jury instruction for possession of drug paraphernalia; and (6) would not have the methamphetamine pipe independently tested. Cherry added that he and defense counsel had irreconcilable differences because of a breakdown in communication and that they "never seem to see eye to eye on anything." CP at 32. The court reviewed the letter and asked defense counsel if he could continue working with Cherry. When counsel replied that he could, the court stated that nothing in Cherry's letter showed that a change of counsel was required and denied his request for a new attorney.

Before Cherry's trial began on September 10, defense counsel presented motions in limine and made a record concerning his proposed lesser-included instructions on possession of drug paraphernalia.[8] When Cherry tried to speak to the court directly, the court told him to speak through his attorney. Cherry then stated that he had filed a state bar association complaint against his attorney and had not wanted him "the whole time." 1 VRP at 20. The court responded that it would not revisit his request for a new attorney.

<u>Legal Financial Obligations</u>

The trial court imposed various legal financial obligations at sentencing. In imposing the standard legal financial obligations, the trial court made the following observation: "You have probably got tens of thousands of dollars of [legal financial obligations] that you owe, and I'm adding another almost 3,000, 4,000 dollars to that today. You are going to have to start, as part of

---

[8] Counsel admitted that these instructions were invalid under *State v. LaPlant*, 157 Wn. App. 685, 239 P.3d 366 (2010) but would not expressly concede the issue because of Cherry's disagreement with his position.

your program, to chip away at those and set up a payment plan with the clerk's office." VRP (Sept. 13, 2013) at 17.

ANALYSIS

A.     CrR 3.6 FINDINGS OF FACT

Cherry argues that the CrR 3.6 findings are invalid because they were not signed by the hearing judge. We disagree.

A successor judge generally lacks authority to enter findings of fact on the basis of testimony heard by a predecessor judge. RCW 2.28.030(2); *State v. Bryant*, 65 Wn. App. 547, 549, 829 P.2d 209 (1992). Nevertheless, the parties may agree to allow a successor judge to make findings of fact based on the evidence in the record. *In re Marriage of Crosetto*, 101 Wn. App. 89, 95-96, 1 P.3d 1180 (2000). In addition, a successor judge may sign findings that the defendant has prepared, with the defendant's consent. *State v. Ward*, 182 Wn. App. 574, 586, 330 P.3d 203, *review denied*, 339 P.3d 634 (2014).

Judge Dixon presided over the CrR 3.6 hearing and gave an oral ruling. Six weeks later, the prosecutor submitted agreed findings to Judge Laurie. When Judge Laurie explained that Judge Dixon was not available and asked defense counsel if he objected to her signing the findings, counsel replied that he did not. Under these circumstances, we find no error in the successor judge's signature. And, even if error did occur, it was harmless because Judge Dixon's oral ruling following the CrR 3.6 hearing was sufficient to allow appellate review of his ruling. *State v. Thompson*, 73 Wn. App. 122, 130, 867 P.2d 691 (1994).

B.    REQUEST FOR NEW COUNSEL

Cherry argues next that the trial court erred in denying his requests for a new attorney.  We disagree.

Criminal defendants have a constitutional right to counsel.  U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  The right to counsel secures the defendant a fair trial by ensuring a meaningful adversarial process, rather than a meaningful attorney-client relationship.  *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).  To justify the appointment of new counsel, a defendant "'must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant.'"  *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004) (quoting *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997) (*Stenson* I), *cert. denied*, 523 U.S. 1008 (1998)).  We review this issue for abuse of discretion.  *State v. Schaller*, 143 Wn. App. 258, 267, 177 P.3d 1139 (2007), *review denied*, 164 Wn.2d 1015 (2008).

Cherry asserted below that he had irreconcilable differences with his attorney that led to a breakdown in communication.  To determine whether he was entitled to new counsel, we examine three factors:  the extent of the conflict, the adequacy of the trial court's inquiry into the conflict, and the timeliness of the motion to substitute counsel.  *State v. Cross*, 156 Wn.2d 580, 607, 132 P.3d 80, *cert. denied*, 549 U.S. 1022 (2006); *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (*Stenson* II).

An irreconcilable conflict occurs when the breakdown of the attorney/client relationship results in the complete denial of counsel.  *Stenson* II, 142 Wn.2d at 722; *Schaller*, 143 Wn. App. at 268.  A complete breakdown exists when a defendant refuses to cooperate or communicate with

his attorney in any way, when the defendant has been at odds with his attorney for an extended time and the relationship is punctuated by quarrels and threats, and when the attorney's actions are especially egregious. *Stenson* II, 142 Wn.2d at 724-25. A disagreement about trial strategy does not raise Sixth Amendment concerns. *Cross*, 156 Wn.2d at 609. A defendant must show that the breakdown exists because of identifiable misconduct by counsel; his loss of trust or confidence in counsel does not require the appointment of new counsel. *Varga*, 151 Wn.2d at 200; *Stenson* II, 142 Wn.2d at 725.

We consider the record and the trial court's judgment about counsel in reviewing an alleged conflict. *Stenson* II, 142 Wn.2d at 730. The record does not show that Cherry and his attorney were unable to communicate or that their communication contained contentious language, derogatory comments, or threats. Cherry's allegations that his attorney was not representing him fully, had not been to see him, and had urged him to plead guilty did not raise claims of identifiable misconduct, nor did his complaints about trial strategy and his inability to see "eye to eye" with his attorney. CP at 32.

Defense counsel moved to suppress Cherry's statements and the results of the search, and the denial of his motions resulted in the admission of highly incriminating evidence. Cherry did not complain about his attorney after the trial began and consulted with him before deciding not to testify. Moreover, jury deliberations lasted three times longer than the State's presentation of evidence, and the trial court imposed a lesser sentence than the State requested. The trial court reminded Cherry of these facts in urging him to take responsibility for his actions:

> THE COURT: Now, Mr. Cherry, I know that throughout this matter you had concerns with [defense counsel] representing you, but you and I both saw how long it took the jury to come to the conclusion.
> THE DEFENDANT: Yes, I did see that. Yes.

21

THE COURT: Yes. And that tells me that you had a pretty good advocate here in the courtroom. To take that long, when they take three times longer than it takes to present the evidence to deliberate, it means they were asking some questions and they were doing some thinking. You also got a pretty good deal on your sentencing.

VRP (Sept. 13, 2013) at 19. We see no irreconcilable conflict on this record.

Cherry complains, however, that the trial court's inquiry into his complaints was inadequate, and he cites as support *United States v. Nguyen*, 262 F.3d 998, 1004 (9th Cir. 2001). After finding a complete breakdown in the attorney-client relationship, the *Nguyen* court also found that the trial court's inquiry into the defendant's complaints about his attorney was inadequate. *Id.* at 1004. The trial court asked only a few cursory questions, did not question the defendant or his attorney privately, and did not interview the witnesses that the defendant offered to support his claims. *Id.* at 1004-05.

We conclude that the trial court made an adequate inquiry into the merits of Cherry's complaints by affording him the opportunity to explain the reasons for his dissatisfaction and by questioning counsel about the complaints. *Varga*, 151 Wn.2d at 200-01; *see Schaller*, 143 Wn. App. at 271 (formal inquiry not essential where defendant states his reasons for dissatisfaction on the record). After Cherry submitted a letter detailing his objections about his attorney to the trial court, the trial court reviewed those objections and questioned counsel before concluding that nothing in the letter warranted a change of counsel. Although timely, Cherry's requests for new counsel did not demonstrate irreconcilable conflict, and we see no abuse of discretion in the trial court's denial of those requests.

C.    ABILITY TO PAY LEGAL FINANCIAL OBLIGATIONS

Finally, Cherry contends that the trial court erred in imposing discretionary legal financial obligations despite its understanding that he had no ability to pay those fees. This argument

No. 45396-7-II

misrepresents the record, which shows that the trial court recognized that Cherry had considerable fees to pay and would need to set up a payment plan. The trial court found, in the judgment and sentence, that Cherry had the ability to pay..

Having failed to challenge this finding below, Cherry may not do so on appeal. *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492, *rev'd and remanded*, 182 Wn.2d 827, 344 P.3d 680 (2015). Our decision in *Blazina* was issued before Cherry's sentencing and provided notice that the failure to object to LFOs during sentencing waives a related claim of error on appeal. 174 Wn. App. at 911. As our Supreme Court noted, an appellate court may exercise its discretion to reach unpreserved claims of error. *Blazina*, 182 Wn.2d at 830. We decline to exercise such discretion here.

We affirm.

Lee, J.

We concur:

Maxa, P.J.

Melnick, J.

23