IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37446-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| PAVEL KANYUSHKIN, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — Pavel Kanyushkin appeals his convictions for vehicular

homicide and failure to remain at the scene of a fatal accident. We affirm.

FACTS

On October 18, 2018, Marilyn Dhaenens was struck and killed by a vehicle while

walking at the easternmost of two intersections between Country Vista Drive and Mission

Avenue in Liberty Lake, Washington. Ms. Dhaenens had left home for her usual morning

walk around 8:00 a.m. and was talking to her husband, Scott Dhaenens, over her cell

phone at the time she was struck. During their conversation, Mr. Dhaenens heard an engine rev and his wife say, "Oh my God." 2 Report of Proceedings (RP) (Jan. 15, 2020) at 391. Then he heard a thump, moaning, and the sound of a vehicle's exhaust trail off. Mr. Dhaenens kept trying to talk to his wife but all he could hear in response was mumbling. Mr. Dhaenens hung up and tried calling again but received a busy signal. He then immediately left home to look for his wife on the route he knew she normally took.

At around 8:15 a.m., an individual traveling in the area discovered Ms. Dhaenens lying in the middle of the southbound lane of Country Vista Drive, about 50 feet south of its intersection with Mission Avenue. The individual called 911. First responders, law enforcement and Mr. Dhaenens arrived at the scene shortly thereafter. Ms. Dhaenens was taken by ambulance to Sacred Heart Medical Center. She later died from her injuries.

The driver of the vehicle who hit Ms. Dhaenens did not remain at the scene and no one witnessed the incident. Law enforcement located two plastic clips a few feet north of where Ms. Dhaenens was found in the road. There were no braking or scuff marks on the road. However, given the location of Ms. Dhaenens, law enforcement believed the vehicle that struck her was traveling southbound on Country Vista Drive.

While there were no direct witnesses, a man who had been walking along Country Vista Drive further south of where Ms. Dhaenens was struck reported seeing a dark red

pickup truck with a table saw in its bed not long after the hit-and-run. The truck was revving its engine and appeared to be speeding. Surveillance footage from a nearby school revealed a red truck had traveled through the area. At least part of the truck's body was lifted and there were items in the truck's bed. Its exhaust was near the right rear tire, and a unique sticker appeared on the back window. Analysis of the surveillance footage indicated the truck was speeding.

Officers soon began searching for similar trucks registered to individuals living in the area. Pavel Kanyushkin's truck was on this list. Officer Mark Holthaus and Sergeant Jeff Jones of the Liberty Lake Police Department went to Mr. Kanyushkin's home, which is located several blocks from the scene of the accident, around 4:30 p.m. that same day. Mr. Kanyushkin's mother told the officers her son had left for work in his truck earlier that day and had not yet returned home. Sergeant Jones left his business card with Mr. Kanyushkin's mother and asked for Mr. Kanyushkin to contact him.

At 5:32 p.m., Mr. Kanyushkin called Sergeant Jones. Mr. Kanyushkin immediately stated he had an alibi: he was at a job site in Airway Heights at 8:00 a.m., thirty minutes away from Liberty Lake. Sergeant Jones believed this to be unusual. In his 16 years as a police officer, no suspect had ever began a conversation with him by stating an alibi.

Sergeant Jones asked if he could look at Mr. Kanyushkin's truck and talk in person. Mr. Kanyushkin agreed and provided his job site location near downtown Spokane.

When Sergeant Jones arrived at the job site less than an hour later, he immediately recognized Mr. Kanyushkin's truck as the vehicle depicted in the surveillance footage. Like the truck in the footage, the front bumper of Mr. Kanyushkin's truck was bent, there was a sag, the muffler was the same, tools were in the truck's bed, and the truck was lifted. Sergeant Jones also observed damage on the front end of the vehicle. Between the truck's midline of the hood to the driver's side headlights, there were dents and cracks. Sergeant Jones believed the damage to be fresh because the cracks were white, and the chrome covering was wrinkled.

Sergeant Jones told Mr. Kanyushkin he was "going to take a look at [his] . . . truck real quick." Clerk's Papers (CP) at 156.[1] In response, Mr. Kanyushkin told Sergeant Jones the front-end damage was on the truck when he bought it. Sergeant Jones told Mr. Kanyushkin he had surveillance footage of a vehicle and the two continued to converse:

> [MR. KANYUSHKIN]: Just for your information. I don't–the reason I agreed to this is 'cause I mean *I coulda been, like, . . . "Hey you can't just check out my car without a warrant"* but I figure I have nothin' [to] hide . . . .

---

[1] Sergeant Jones's interactions with Mr. Kanyushkin were captured on the officer's body camera.

| | |
|---|---|
| [SERGEANT JONES]: | If you didn't do anything right? |
| [MR. KANYUSHKIN]: | Well yeah, oh, I didn't do anything so I have nothin' to hide and I feel bad for whoever did this . . . . |
| [SERGEANT JONES]: | Okay well if you don't mind me, I'm just gonna look around. Um, if you got stuff to do with your boss. I'm not gonna go in the vehicle at all. |
| [MR. KANYUSHKIN]: | Okay. |
| [SEARGEANT JONES]: | I'm ju—I'm just gonna look around. So if I have any questions, I'll . . . holler at you all right. |
| [MR. KANYUSHKIN]: | All right. |

*Id*. at 250 (emphasis added).

Mr. Kanyushkin stated the first job site he stopped at that morning was at Mackenzie Beach Lane in Liberty Lake. When his boss called at 8:03 a.m., he was already there picking up tools. Mr. Kanyushkin told Sergeant Jones he did not drive through the intersection where Marilyn Dhaenens was hit, even though it was near the beginning of the quickest route from his home to the job site. He also stated he did not drive by the school that had provided the surveillance footage.

Sergeant Jones explained he was not accusing Mr. Kanyushkin of being involved in the hit-and-run, but a similar looking truck was seen in the area around the time of the accident. Then, Sergeant Jones asked Mr. Kanyushkin if he could take the truck back to the station to look at it further. Mr. Kanyushkin did not directly answer. He stated he needed the vehicle to get to work and did not have another. Sergeant Jones asked to take

5

some pictures for his report, and said he hoped Mr. Kanyushkin was not involved in the collision.[2] Sergeant Jones stated "You know? Um, you know, right now, we're just having a conversation. You know? You're not in handcuffs, you're not under arrest for anything, okay?" *Id*. at 176. Mr. Kanyushkin responded, "Yeah." *Id*. Sergeant Jones noted he just wanted to exclude Mr. Kanyushkin as a suspect in the investigation.

Mr. Kanyushkin expressed some unease. Since the police had video and pictures of a truck in the area appearing to be his, Mr. Kanyushkin wondered if it made him a suspect and if he would be blamed for Ms. Dhaenens's death. Sergeant Jones stated "No, not necessarily. . . . [W]e've been going and looking for a lot—lots of Dodge trucks. In town. Not just yours. . . . But we also have to rule out vehicles, too. And if we can rule out your vehicle . . . then . . . that only helps you, correct?" *Id*. at 177-78. Mr. Kanyushkin agreed. Sergeant Jones again stated he was not there to accuse but to help Mr. Kanyushkin, and his cooperation would go a long way. Then, Sergeant Jones again asked to take pictures of the front of the truck and Mr. Kanyushkin agreed.

Around this time, Alex Zhelez, Mr. Kanyushkin's boss, interrupted to clarify that morning's timeline. Mr. Zhelez said he spoke to Mr. Kanyushkin at 8:03 a.m.

---

[2] Mr. Kanyushkin stated, "No," but it isn't clear whether he is saying no to the photos or being involved in the accident. *Id*. at 176.

Mr. Kanyushkin told Mr. Zhelez he just picked up tools at the Mackenzie Beach Lane job site. Mr. Kanyushkin arrived at work in Airway Heights about an hour later.

Sergeant Jones reiterated his obligation to investigate Mr. Kanyushkin based on the similarities between his truck and the one seen in the area. He stated he was not trying to give Mr. Kanyushkin "a hard time," but wanted to exclude him so he could find the person responsible. *Id*. at 183-84. Sergeant Jones and Mr. Kanyushkin then discussed the similarities and differences between his truck and the truck in the photo.

Sergeant Jones asked again whether he could: "take [Mr. Kanyushkin's] truck. And process it. Just to rule you out." *Id*. at 191. Mr. Kanyushkin stated "As much as I'd like that, I have no (INDISTINCT) of getting to work." *Id*. Mr. Kanyushkin did not understand why Sergeant Jones needed to take the truck. Sergeant Jones explained the police needed to do their "due diligence." *Id*. at 192. He also noted the police needed to exclude him as a suspect due to "[t]he severity of what's going on." *Id*. Sergeant Jones again suggested Mr. Kanyushkin's cooperation would look good for him. Then, Mr. Zhelez stated "Dude, if you didn't do it, let 'em have the truck." *Id*. Mr. Kanyushkin again expressed concern about getting to work, asking "Is there any other way? Without me having to drop my truck off? So that I can still have it to drive to work?" *Id*. at 193. Sergeant Jones said there was not. Sergeant Jones further noted "with the severity of what

7

I'm looking at? I need to rule you out. And so, my other option is . . . to seize the vehicle." *Id*. at 194. Mr. Zhelez said "Just let 'em have the truck . . . survive without it." *Id*. Mr. Kanyushkin agreed to let Sergeant Jones take the truck.

While waiting for a tow truck, Sergeant Jones and Mr. Kanyushkin continued to converse. Sergeant Jones told Mr. Kanyushkin why he was looking further at his truck:

| | |
|---|---|
| [SERGEANT JONES]: | Um, there's some stuff on the front that I wanna look at closer and I'm totally bein' honest with you. . . . And I want somebody that knows a whole lot more than me . . . uh, to look at that. . . . So they look at it. They process it. . . . If they say, ay, nothin' . . . we can rule this vehicle out. . . . We're good, you get your truck back and I can move on to, you know, lookin' for who I really need to look for. |
| [MR. KANYUSHKIN]: | Yeah. |
| [SERGEANT JONES]: | And plus your cooperation, you know, with us looks, you know, really good. |

*Id*. at 289. Mr. Kanyushkin's parents arrived to pick him up. They asked, "Do you have a warrant from the court to take the vehicle?" *Id*. at 291. Officer Jones stated the vehicle was being voluntarily provided. Sergeant Jones and Mr. Kanyushkin's parents further talked about Mr. Kanyushkin's previous concerns about getting to work. Mr. Kanyushkin stated to his parents, "You're making it worse." *Id*. at 293. Mr. Kanyushkin left with his parents. His truck was then towed to the Liberty Lake Police Department.

A warrant for Mr. Kanyushkin's truck was issued the next day. Officers discovered Mr. Kanyushkin's truck had similar features and damage as the truck depicted on the surveillance footage. The grill also appeared to be missing clips matching those recovered at the scene. A forensic scientist later determined the plastic tabs recovered had been part of the truck's grill. Plastic material on the hood of the truck matched earbuds Ms. Dhaenens was wearing at the time she was struck.

After examining the truck, law enforcement called Mr. Kanyushkin to pick up his vehicle. When Mr. Kanyushkin arrived, Sergeant Jones asked if he could answer additional questions. Mr. Kanyushkin was escorted to an interview room where three officers were present. Sergeant Jones provided Mr. Kanyushkin a *Miranda*[3] warning. Mr. Kanyushkin subsequently admitted that on the morning of the accident he drove through the intersection where Ms. Dhaenens was hit and continued down Country Vista Drive. Mr. Kanyushkin stated he stopped at the intersection and did not see any vehicles or people. While driving through the intersection, it felt like he hit a curb or something, but he was unsure. Mr. Kanyushkin said he paused for a moment and then drove off.

When Mr. Kanyushkin arrived at the first job site, he examined the truck's front to see if there was damage or blood. He did not think he hit a person. When Mr. Kanyushkin

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

heard Ms. Dhaenens had died, he did not come forward because he was "too afraid of the consequences." CP at 63. Prior to taking Mr. Kanyushkin into custody, Mr. Kanyushkin told his family members, "I did it,"[4] and to go home. *Id*. at 324.

Officer Austin Brantingham transported Mr. Kanyushkin to the Spokane County Jail. During transport, Mr. Kanyushkin stated that when he left home on the morning of the accident his windows were frosted over, and he was looking through a gap on the lower part of the windshield. Since Mr. Kanyushkin's truck was big and loud, he hoped people would get out of his way. Mr. Kanyushkin reiterated he thought he hit a log or roadkill. Since he did not see blood on the truck and was not going very fast, he did not think he hit a person. Mr. Kanyushkin also stated he did not stop to see whether he hit anything because he was late for work.

The police seized Mr. Kanyushkin's cell phone during the custodial interview and later obtained a warrant. A search of the phone showed Mr. Kanyushkin called Mr. Zhelez at 8:11 a.m. on October 18, 2018. The call lasted three minutes and three seconds. Internet searches retrieved from the cell phone showed Mr. Kanyushkin conducted searches the day after the collision for "Liberty Lake crash," "woman dies

---

[4] Mr. Kanyushkin did not specify what he did but Officer Holthaus and Officer Michael Bogenreif testified they believed Mr. Kanyushkin was referring to the hit-and-run when he made this statement.

in hit and run," "Marilyn Dhaenens," "how long does it take to get a search warrant," and "how fast do you need to be driving to kill an adult pedestrian." 4 RP (Jan. 17, 2020) at 808-09.

The State charged Mr. Kanyushkin with vehicular homicide and failure to remain at the scene of a fatal accident. Prior to the start of trial, Mr. Kanyushkin unsuccessfully moved to suppress evidence seized from his truck and cell phone. In denying the motion to suppress, the trial court found that, prior to his arrest, all interactions between Mr. Kanyushkin and the police were completely voluntary.

A jury convicted Mr. Kanyushkin as charged. He was sentenced to 48 months in prison followed by 18 months of community custody. Mr. Kanyushkin has filed a timely appeal, challenging the trial court's suppression decisions.

## ANALYSIS

*Consent to seizure of the truck*

Mr. Kanyushkin argues the trial court should have granted his motion to suppress because he did not voluntarily agree to the seizure of his truck. Because he asserts the initial seizure was invalid, Mr. Kanyushkin claims all subsequently obtained evidence should have been suppressed from the State's case in chief at trial.

Law enforcement generally must obtain a warrant prior to seizing property. *See* U.S. CONST. amend. IV; WASH. CONST. art. I, § 7. But consent is an exception to the warrant requirement. *State v. Thompson,* 151 Wn.2d 793, 803, 92 P.3d 228 (2004). The State has the burden of proving valid consent. This includes showing consent was voluntarily given, free from coercion or duress. *State v. O'Neill,* 148 Wn.2d 564, 588-90, 62 P.3d 489 (2003). We look to the totality of the circumstances in assessing whether the State has proven voluntary consent. *Id.* at 588.

Mr. Kanyushkin argues his consent was invalid for six reasons: (1) he was not provided *Miranda* warnings, (2) he was not informed he could refuse to consent, (3) he is the 21-year-old son of immigrants, (4) Sergeant Jones misrepresented the purpose of his investigation, (5) Sergeant Jones repeatedly asked for Mr. Kanyushkin's consent, and (6) Sergeant Jones threatened to seize the truck.

The first four contentions are readily resolved against Mr. Kanyushkin. Because he was not in custody, *Miranda* warnings were not required. *See O'Neill*, 148 Wn.2d at 589. Although Mr. Kanyushkin is young and was not advised of the right not to consent, he appeared cognizant of his rights and on his own brought up subjects such as an alibi and the necessity of a warrant. While Sergeant Jones did not share with Mr. Kanyushkin that he was a primary suspect, he was never dishonest. Sergeant Jones advised Mr.

12

Kanyushkin he was investigating the hit-and-run accident that had killed Ms. Dhaenens. He also told Mr. Kanyushkin his truck was similar the one observed on video surveillance. It was technically accurate for Sergeant Jones to advise Mr. Kanyushkin a search of his vehicle could be exculpatory. Sergeant Jones may have emphasized facts favorable to Mr. Kanyushkin while asking for consent, but there was no actual deception.

Mr. Kanyushkin's consent was not undermined by repeated requests. Unlike *O'Neill*, Mr. Kanyushkin never expressly denied Sergeant Jones's request for consent. *Id*. at 573, 591. Instead, he merely voiced hesitation based on his need for transportation to and from work. Furthermore, Sergeant Jones did not "repeatedly press[] the issue." *See id*. at 589. Instead, Sergeant Jones asked for consent only at two points during the course of a lengthy conversation.

Finally, Mr. Kanyushkin's consent was not made in response to a claim of lawful authority. Officers do not undermine consent merely by accurately explaining their ability to obtain a warrant. *State v. Cherry*, 191 Wn. App. 456, 472, 362 P.3d 313 (2015) (citing *State v. Smith*, 115 Wn.2d 775, 790, 801 P.2d 975 (1990)). That is all that happened here. At the time Sergeant Jones asked for consent, he already had probable cause to seize Mr. Kanyushkin's truck. The truck closely resembled the vehicle associated with the hit-and-run. Sergeant Jones noticed fresh damage to the truck, consistent with a

13

recent impact. Mr. Kanyushkin also lived near the incident site and made suspicious comments, such as volunteering to have an alibi. Although this combination of circumstances may have not been enough to justify a jury verdict, it was sufficient to permit issuance of a warrant. Sergeant Jones did not undermine the validity of Mr. Kanyushkin's consent by accurately explaining his ability to obtain a warrant for purposes of seizing the truck.

Additional factors support the trial court's finding of voluntariness. Prior to consenting to the seizure of his truck, Mr. Kanyushkin voluntarily cooperated with Sergeant Jones. He talked to Sergeant Jones about his whereabouts that morning and allowed Sergeant Jones to look over and take pictures of his truck. The totality of the circumstances shows Mr. Kanyushkin validly consented to the seizure of his truck.

*Cell phone warrant*

Mr. Kanyushkin argues the search of his cell phone was invalid because it was not supported by probable cause. The State does not defend the validity of the warrant. Instead, the State claims the fruits of the warrant were harmless. According to the State, the information obtained from the cell phone warrant was not relevant to any of the contested elements of proof at trial.

14

When evidence obtained in violation of a defendant's constitutional rights is introduced at trial we apply a constitutional error analysis to assess whether the evidence was harmless. *State v. Scherf*, 192 Wn.2d 350, 370, 429 P.3d 776 (2018). Under the constitutional harmless error standard, the State must prove improperly admitted evidence was harmless beyond a reasonable doubt. *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007). This can be established by showing "untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." *Id.* at 636.

The State introduced only two aspects of the cell phone information: (1) Mr. Kanyushkin's phone made an outbound call at the approximate time of the hit-and-run and (2) Mr. Kanyushkin engaged in internet searches about the collision. Both categories of evidence helped Mr. Kanyushkin's case, instead of harming it. Mr. Kanyushkin's expert relied on the outbound call information to opine as to why Mr. Kanyushkin was not negligent. In addition, the internet searches did not take place until after Mr. Kanyushkin interacted with Sergeant Jones on October 18. The searches were therefore consistent with the behavior of an innocent person. Had Mr. Kanyushkin been aware of hitting someone at the time of the collision, one would expect he would engage in internet searches shortly thereafter. Instead, Mr. Kanyushkin did not begin searching on his phone until after the initial contact with police. Mr. Kanyushkin's search activity was consistent

with the behavior of an innocent person who became worried about his circumstances only after talking to the police. We agree with the State that introduction of the cell phone evidence at trial was harmless beyond a reasonable doubt.

## CONCLUSION

The judgment of conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, C.J.
Pennell, C.J.

WE CONCUR:

_____
Siddoway, J.

_____
Staab, J.