# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.    32683-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER WITHDRAWING |
| RAY LENY BETANCOURTH, | ) | OPINION |
| | ) | |
| Appellant. | ) | |

THE COURT on its own motion finds that the opinion filed June 30, 2016, should be withdrawn:

THEREFORE, IT IS ORDERED, the opinion filed June 30, 2016, is hereby withdrawn and a new opinion will be filed this day.

PANEL: Judges Fearing, Siddoway, Pennell

FOR THE COURT:

_____
GEORGE B. FEARING, Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32683-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAY LENY BETANCOURTH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — A jury found Ray Betancourth guilty of second degree felony

murder and first degree assault. We reverse and remand for a new trial Betancourth's

conviction for second degree murder. We affirm his conviction for first degree assault.

We also affirm a trial court ruling denying Betancourth's motions to suppress statements

he made during police station interviews and text messages subpoenaed from Verizon.

FACTS

Our statement of facts comes from both trial testimony and two motions to

suppress evidence. We begin with some trial testimony on the charges of second degree

murder and first degree assault against Ray Betancourth. On September 17, 2012,

Betancourth, a resident of Toppenish, noticed damage to windows of his Honda Civic. On September 19, on a basis unknown to us, Betancourth identified one of the window caperers as Terrence Frank.

During the afternoon of September 19, 2012, Ray Betancourth and his girlfriend, Nancy Arriaga, texted one another:

> [Girlfriend:] Did you see the video Eiree posted on Facebook[?] Is that the black guy who broke your window[?]
> [Betancourth:] Yeah, I just—did.
> [Girlfriend:] Is that him?
> [Betancourth:] Yep. Both those fools.
> [Girlfriend:] Cool. Cool.
> [Betancourth:] Yep, I want to beat the shit of o' [sic] them.

Report of Proceedings (RP) at 1435 (internal quotation marks omitted).

In the early evening of September 19, 2012, Ray Betancourth assembled companions to harass Terrence Frank. Betancourth first summoned Marco Cardenas. Betancourth advised Cardenas that he would shortly retrieve David Chavez and Mario Cervantes. He telephoned Cervantes, while Chavez visited Cervantes' house. Betancourth informed Chavez and Cervantes that he had located one of the men who broke his car windows and that he "wanted to beat his ass." RP at 905. Ten minutes later, Ray Betancourth, driving a four-door Ford pickup truck, arrived at Cervantes' home with Marco Cardenas riding shotgun. Cervantes and Chavez entered into the backseat of the truck. The quartet journeyed through Toppenish and found Terrence Frank, with

2

Jordan Lemus and Jose Rodriguez, walking on a sidewalk along the city's Madison Street.

Ray Betancourth stopped the pickup truck at a stop sign. David Chavez, from the backseat, then saw Marco Cardenas unfasten his seatbelt and move his hands. Chavez also heard Mario Cervantes tell Cardenas to "put that shit away." RP at 910. David Chavez did not see what object Cardenas placed in his hand because Chavez sat directly behind Cardenas. Nevertheless, Chavez noticed Marco Cardenas put away the object. Betancourth pulled a firearm from the truck door pocket, and placed it under his driver's seat. All four exited the truck.

The four companions planned for Ray Betancourth to fight Terrence Frank without anyone else scrapping. Betancourth hollered to the three walking on the sidewalk: "Who broke my windows?" RP at 917. Betancourth, Cervantes, Cardenas, and Chavez then chased the other three. Terrence Frank ran down the street, while Jordan Lemus and Jose Rodriguez ran into an alley south of Madison Street.

David Chavez testified that all four pursuers, with Marco Cardenas leading, followed Lemus and Rodriguez into the alley. Lemus jumped a fence, after which Marco Cardenas pulled a gun and shot twice. One or both bullets struck Rodriguez in the head. David Chavez testified that he did not know that Marco Cardenas carried a gun until the shots fired.

According to Ray Betancourth, before Marco Cardenas fired the gun, Mario

3

Cervantes yelled: "the truck." RP at 1220. Betancourth then ended his chase out of recognition that he left the pickup unattended and with the engine running. He returned to his truck to turn off the motor. As he opened the driver's door to the pickup, Betancourth heard "popping sounds." RP at 1221. According to Betancourth, he also did not know Marco Cardenas carried a gun. He did not expect Cardenas to shoot anyone.

According to David Chavez, Ray Betancourth, Marco Cardenas, Chavez, and Mario Cervantes quickly returned to Betancourth's Ford truck after the shooting and the truck sped away. According to Ray Betancourth, once he entered his pickup truck and turned off the ignition, he noticed Marco Cardenas and David Chavez frantically sprinting to the pickup. Both hopped into the backseat of the truck. Betancourth then heard a thud and saw, through the rear view mirror, Mario Cervantes jumping into the truck's bed. Betancourth, not knowing what transpired, drove away.

David Chavez testified that Betancourth, Chavez, and Cervantes asked Cardenas, after the quartet returned to the pickup: "What the fuck, what—what are you doing?" RP at 944. Ray Betancourth testified he heard David Chavez twice loudly comment to Marco Cardenas: "You shot him." RP at 1223. Cardenas responded: "You think so." RP at 1224. Chavez also said to Marco Cardenas: "You fucked up." RP at 1226.

The foursome traveled out of Toppenish. David Chavez testified that Ray Betancourth stopped the pickup truck on a Wapato bridge where Cardenas handed the gun to Betancourth, who threw it into the river. Betancourth denies stopping the truck on

4

a bridge or handling a gun. Betancourth drove the truck to a friend's home in Buena. According to Betancourth, when the four arrived in Buena, the three others repeatedly questioned Marco Cardenas why he brought a gun to the fight.

At 6:20 p.m. on September 19, 2012, Toppenish Police Officer Casey Gillette traveled to the alley adjacent to Madison Street because of a report of gun shots and of a man stricken in the alley. Officer Gillette found a resident of a nearby house attending to an unconscious Jose Rodriguez. Officer Gillette summoned medical aid, which arrived and transported Rodriguez to the hospital. Fifteen-year-old Rodriguez died the following day.

Witnesses to the chase identified Ray Betancourth's Ford pickup truck as the vehicle used by Jose Rodriguez's assailants. Based on this identification, Toppenish police seized the truck on September 21.

The following portion of the statement of facts derives from a hearing to suppress statements uttered by Ray Betancourth. During the evening of September 21, 2012, Betancourth and his father entered the Toppenish police station. Toppenish Police Detective Jaban Brownell spoke to Betancourth's father about the seizure of the pickup truck, while Betancourth stood nearby. Eventually Detective Brownell asked Ray Betancourth to speak with him, Detective Damon Dunsmore, and Sergeant Paul Logan. The police then considered Betancourth a suspect in the shooting death of Jose Rodriguez. Brownell did not mention to Betancourth any reason for requesting the

5

interview. Betancourth offered no objection, and Detective Brownell led Betancourth to an investigations office at the back of the police station. Brownell told Betancourth that the interview was voluntary. Betancourth indicated he understood the voluntary nature of the interview, and Brownell further explained to Betancourth that he could leave at any time. Detective Brownell did not inform Betancourth that the latter was under arrest. Brownell did not place Betancourth in handcuffs.

Ray Betancourth's father asked to be present during the September 21 interview of his son, but Detective Jaban Brownell denied the request. Detective Brownell did not ask Betancourth if he wished his father present. Brownell and the other officers knew that Betancourth was eighteen years old at the time.

The Toppenish police investigations office was a converted, small single-wide trailer, approximately nine-feet wide by twenty-feet long, where three detectives worked at desks. Ray Betancourth sat in a chair near the trailer entry door. Detective Jaban Brownell, Detective Damon Dunsmore, and Sergeant Paul Logan questioned Betancourth for twenty to thirty minutes inside the trailer. Nobody recorded the questioning. The three officers asked Betancourth about his pickup truck's involvement in the shooting. One or more questions sought to elicit an admission from Betancourth as to his presence at the crime scene. Betancourth denied any involvement in a shooting. Betancourth left the trailer after the officers finished asking questions.

We return to trial testimony. Sergeant Paul Logan followed Ray Betancourth to

the Toppenish police station parking lot where he asked Betancourth to look at the latter's cell phone. Betancourth gave him permission, and Logan obtained Betancourth's cell phone number. On September 21, Detective Damon Dunsmore sent a preservation letter to Verizon Wireless to preserve records associated with Betancourth's phone number.

On September 25, 2012, the Yakima County District Court purportedly granted a search warrant ordering Cellco Partnership, dba Verizon Wireless (Verizon), to provide Ray Betancourth's cell phone records, including text messages, from September 19 to September 25, 2012. This court has a copy of the affidavit in support of the search warrant but not the search warrant itself. Detective Damon Dunsmore faxed the warrant to Verizon's custodian of records in New Jersey, and Verizon sent the text messages to Dunsmore.

We return to testimony from the motion to suppress hearing. During the afternoon of October 9, 2012, Sergeant Paul Logan called Ray Betancourth and asked him to come to the Toppenish police station to answer more questions about the Ford pickup truck. Because he lacked a vehicle, Betancourth's mother drove him to the police station. Detective Damon Dunsmore took Betancourth to the detectives' trailer. Logan and Detective Jaban Brownell soon entered the trailer. During the interview, no officer told Betancourth that he was under arrest or that he could not leave the trailer. No officer delivered Betancourth the *Miranda* warnings. The interview lasted twenty to thirty minutes.

7

During the October 9 interview, the three Toppenish police officers presented incriminating evidence to Ray Betancourth. Detective Damon Dunsmore, Betancourth's former school resource officer, remained silent. Detective Jaban Brownell acted polite. Sergeant Paul Logan portrayed anger and hurled accusations at Betancourth. Betancourth testified that Logan's behavior intimidated and frightened him, particularly since Logan was a larger man than Betancourth. Once Logan grew hostile, Betancourth no longer deemed himself free to leave the trailer.

During the October 9 interview, Ray Betancourth initially denied his presence at the scene of the shooting of Jose Rodriguez. Detective Jaban Brownell testified at trial:

> So, I explained to Mr. Betancourth what . . . I had believed had occurred. And I explained . . . that the defendant was driving with another subject in this white truck, saw the victim and his two friends, returned to another location in Toppenish to elicit reinforcements, returned to this location to look for these three victims, and in the process of confronting them for a physical altercation one of them was shot. And then they left.
> So that was the information I was trying to elicit from him. An interview, an interrogation, call it what you will, I was trying to elicit some form of information from him.

RP at 1175.

Ray Betancourth again denied involvement in the crime. He portrayed confidence and occasionally flashed smirks. Detective Jaban Brownell showed Betancourth text messages from the latter's phone that police obtained from Verizon. Brownell played a three to four minute audio statement of Nancy Arriaga, Betancourth's girlfriend. Betancourth first denied that the voice on the recording was Arriaga's voice. As the

8

audio played further, his body language changed and Betancourth said: "Guess you know what happened then." RP at 1179.

Ray Betancourth asked to speak to an attorney, and the interview ended. Police arrested Betancourth the next day.

The Toppenish police department later learned that, under a recent court ruling, the district court search warrant for Ray Betancourth's cell phone records was invalid. A superior court search warrant was required to subpoena records in another state. On October 9, 2013, the Yakima County Superior Court granted, at Detective Jaban Brownell's request, a search warrant to obtain the same phone records procured from Verizon through the district court warrant. The warrant read in part:

> NOW, THEREFORE, you are hereby commanded in the name of the State of Washington within ten (10) days of this date, to use such force as may be necessary [language obliterated by clerk's paper number] business and to seize the above described evidence, and to safely keep the same as provided by law and to make a return of this warrant within three (3) days of the date thereof, showing all acts and things done hereunder. . . .

Clerk's Papers (CP) at 70-71.

On October 15, Brownell sent the warrant by fax to the custodian of records in Verizon's legal compliance office in San Angelo, Texas, with a message that "THESE RECORDS WERE REQUESTED BY A DISTRICT COURT WARRANT PREVIOUSLY. BASED ON RECENT COURT RULING THEY NEED TO BE BASED ON A SUPERIOR COURT WARRANT." CP at 76. Verizon never produced

9

the records again.

## PROCEDURE

The State of Washington charged Ray Betancourth with first degree assault and

second degree felony murder for the assault and death of Jose Rodriguez.

Ray Betancourth moved to suppress the cell phone records and his statements to

the Toppenish police during the September 21 and October 9, 2012 interviews. During

the hearing to suppress the police station statements, Detective Jaban Brownell and Ray

Betancourth testified. The trial court denied the motion to suppress. The court reasoned

that no reasonable person would believe he was under arrest during either of the two

interviews. Regarding the October 9 interview, the court commented:

> Mr. Betancourth's recall of the events leading up to his conversation
> with officers on October 9 was relatively—sparse, didn't remember much
> about the circumstances; most of the detail he provided was of the actual
> conversation. Although he—it does not appear that he was told he was free
> to leave, at no point was he placed under arrest, he was never handcuffed,
> he was never told he couldn't leave.
> . . . .
> . . . There was nothing coercive about the interview with the
> exception of Mr. Betancourth's statements regarding Sgt. Logan, but even
> in his testimony, that is, Mr. Betancourth's testimony, there was no
> suggestion that Sgt. Logan stood up or displayed himself in an aggressive
> manner. He did indicate he was nervous, or afraid of him, but that was—
> based on what I saw from Mr. Betancourth I would not place significant
> credibility on that statement.

RP at 84-85.

The trial court entered, in part, the following findings of fact and conclusions of

10

No. 32683-7-III
*State v. Betancourth*

law after the motion to suppress hearing:

## I. FINDINGS OF FACT

1.1 During the investigation of the homicide which is the subject matter of this case, the Toppenish Police Department twice contacted the defendant and questioned him. The State now seeks to introduce evidence regarding the second of these two conversations. The first conversation took place on September 21, 2012.

1.2 On that date the defendant came to the Toppenish Police Department with his father. He had an approximately 20 to 30 minute conversation with officers at that time.

1.3 He was eighteen years of age. He wanted to have his father present for the conversation but his father was not allowed to be present.

1.4 The defendant was not under arrest and was free to leave at any time. He was never told he was under arrest. Nor was he handcuffed or told he was not free to leave.

. . . .

1.6 On October 9, 2012 the defendant came to the Toppenish Police Department with his mother to talk about a truck which had been seized civilly. The defendant was not under arrest and was free to leave. He was never told he was under arrest, handcuffed, or told he was not free to leave.

1.7 Toppenish Police Department Detectives Jaban Brownell and Damon Dunsmore were present during this conversation, as was Sargent Paul Logan. The defendant testified that he got along fine with Brownell and Dunsmore, but claims that he was nervous and felt intimidated by Logan. The court does not find this claim credible. As he testified the defendant presented as being very confident in a potentially stressful situation.

. . . .

1.9 The defendant did actually terminate the October 9, 2012 contact so that he could consult with his attorney. The officers did not impede or object to his doing so.

## II. CONCLUSIONS OF LAW

2.1 Miranda warnings were not required during either of September 21, 2012 or October 9, 2012 conversations which the Toppenish officers

11

had with the defendant as no reasonable person in his position would believe that the[y] were under arrest on either occasion.

CP at 104-06.

The trial court later held a CrR 3.6 hearing on Ray Betancourth's motion to suppress his cell phone records because the district court warrant was not valid. The State responded, in part, to the motion by asserting that the independent source doctrine applied. The court heard testimony from Detective Jaban Brownell, Detective Damon Dunsmore, and Melissa Sandoval, custodian of records for Verizon Wireless. Sandoval testified that Verizon still maintained the records of Betancourth's phone as requested in the preservation letter. She testified that Verizon could produce the records again if requested to do so. During argument, the State asserted the decision *State v. Miles*, 159 Wn. App. 282, 244 P.3d 1030 (2011), as analogous. *State v. Miles* concerns the independent source doctrine. Betancourth responded to the independent source doctrine argument. The trial court denied Betancourth's motion to suppress the text messages on the basis that the district court order was entitled to full faith and credit. The trial court did not expressly mention the independent source doctrine in its ruling but stated that producing the records again would be fruitless and any violation of the statute was technical in nature.

The State of Washington's prosecution of Ray Betancourth proceeded to a jury trial. During trial, Betancourth raised the defense, to felony murder, available under

12

RCW 9A.32.050(1)(b). The defense applies if Betancourth did not know Marco Cardenas was armed at the time of the chase of Jose Rodriguez.

During the State's case in chief, Detective Jaban Brownell testified to the two police interviews of Ray Betancourth. Brownell remarked that, during the September 21 interview, Betancourth provided different information from his father as to the use of the Ford pickup on the date of the shooting. In response, Betancourth declared his father to be lying. He denied any involvement in the shooting. Concerning the October 21 interview, Brownell testified to Betancourth's confidence until police played the audio recording of his girlfriend. Betancourth then changed his posture and remarked: "Guess you know what happened then." RP at 1179.

The State also raised the station-house statements when cross-examining Ray Betancourth. Betancourth conceded he lied when he told the officers that he knew nothing about the shooting. During trial, the State showed the jury text messages from Betancourth's phone records, including one message when Betancourth wrote: "'Yep. I wanna beat the shit of both of them.' Smiley face." RP at 1122. Ray Betancourth testified at trial that he did not know Marco Cardenas had a gun and, before the shooting, he returned to his truck to turn off the motor. The prosecution asked Ray Betancourth about the content of text messages he sent before the confrontation. He admitted that he wrote that he wanted to "beat their ass." RP at 1203. Later the prosecution asked Betancourth and he answered:

13

> Q All right. Okay. But you were going to beat his ass. Yes[.]
> A Well, that's how I felt, like—

RP at 1205.

During closing argument, the State uttered the phrase, or a variation of the phrase:

"beat the shit out of" thirty-eight times. The State also reviewed the police station

interviews, Ray Betancourth's repeated denial of any involvement in the shooting, and

his subsequent implied admission. The State focused on Betancourth's text when

discussing intent to commit substantial bodily harm.

> [Betancourth's] intent was to beat the shit out of someone and when
> you beat the shit out of them they're likely to have black eyes—as an
> example. Or a function of their bodily parts might be impaired. If you
> really get the shit beaten out of you aren't you going to be kind of all sore
> all over, have a hard time moving various parts of your body because that?
> [sic] Well, that would be substantial bodily harm.

RP at 1447. Also during closing arguments, the State argued concerning Ray

Betancourth's defense:

> But there's another thing here. And that is that there's a statutory
> defense. And when I say that, you know that you've been told over and
> over—over again, the state has to prove the elements beyond a reasonable
> doubt. And the state has proved the elements beyond a reasonable doubt of
> felony murder.
> But what the law says is that, you know, this felony murder, it does
> cast a pretty broad net. Especially when you're talking about the conduct
> of other people. So there's an affirmative defense that he can bring, and if
> he can prove by a preponderance of the evidence, if he can prove, more
> likely than not, certain things—and we're going to look at another list of
> things—he has to prove all these things by a preponderance of the
> evidence, and if he does that, even though I proved the elements beyond a
> reasonable doubt then you would still have a duty to find him not guilty.

14

So let's look at what the elements of that [defense] are.

And I'm going to—He has to prove all four of these. I'm going to argue to you that he really doesn't prove any of them.

Number one, he has to show he did not commit the homicidal act. That's true. But he—also has to show that he didn't solicit, request, importune—in other words provide the opportunity—or aid the commission of the homicidal act.

Well, he provided—importune means provide the opportunity. He provided the opportunity for the homicidal act, didn't he? He brought Marcos to the scene where the shooting took place. Rode around with him in a truck looking for Terrence and his friends. Went back and got reinforcements, took him back to the scene of the crime—

MR. THERRIEN [Betancourth's counsel]: Your Honor, I think that's a misstatement of the law. I think—he's talking about—he's referring to the second degree assault.

MR. SOUKUP [State's counsel]: I'm referring to this instruction right here, your Honor.

THE COURT: Objection's overruled.

MR. SOUKUP: So he gave him the opportunity, and he—and he aided it. It's—That's it right there. He can't show that by a preponderance of the evidence that he didn't do that. So you should deny it on that basis alone.

RP at 1450-51.

The trial court instructed the jury on second degree felony murder and first degree

assault. The court also provided an instruction for a felony murder affirmative defense:

It is a defense to a charge of Murder in the Second Degree based upon committing the crime of second degree assault that the defendant:

(1) Did not commit the homicidal act or in any way solicit, request, command, [i]mportune, cause, or aid the commission thereof; and

(2) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(3) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(4) Had no reasonable ground to believe that any other participant

15

intended to engage in conduct likely to result in death or serious physical injury.

The defendant has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty as to this charge.

CP at 170.

The jury found Ray Betancourth guilty of second degree murder and first degree assault and imposed a firearm enhancement for each crime. The trial court sentenced Betancourth, who lacked a criminal history, to 336 months confinement and imposed the following financial obligations:

| RTN | $5,700.77 | Restitution distributed to: Crime Victims Compensation, subject to modification |
| PCV | $500.00 | Crime Penalty Assessment- felony or gross misd. (RCW 7.68.035) |
| FRC | $200.00 | Criminal filing fee |
| PUB | $600.00 | Court appointed attorney recoupment (RCW 9.94A.760) |
| DNA | $100.00 | DNA collection fee (any felony committed after 7/1/02) (RCW 43.43.7541) |
| JFR | $250.00 | Jury fee |
| | $7,350.77 | TOTAL |

CP at 193 (boldface omitted). The trial court also found Betancourth financially able to pay the costs of incarceration and medical care costs incurred by Yakima County and ordered Betancourth to pay both.

After Ray Betancourth's appeal, the trial court entered findings of fact and

16

No. 32683-7-III
*State v. Betancourth*

conclusions of law with regard to the order denying the motion to suppress the Verizon

text messages. The findings and conclusions read, in part:

I. FINDINGS OF FACT

1. On September 25, 2012, a Yakima County District Court Judge, Donald Engle issued a warrant for Ray Betancourth's phone records to Cellco Partnership, dba Verizon Wireless in New Jersey.

2. That warrant was faxed to (888) 667-0026. Cellco responded and provided records associated with phone number (509) 314-1688.

3. Verizon Wireless does business within the State of Washington, but the Verizon Wireless office which responds to search warrants is geographically located outside of the State of Washington.

4. Subsequently, one of the Yakima County Superior Court Judges ruled in another case that this procedure was problematic because a District Court Judge does not have authority to issue out-of-State search warrants.

5. As a result, Deputy Prosecuting Attorney David Soukup, who was assigned to this case, contacted Toppenish Police Department Detective Brownell in October 2013 and requested that he obtain the same warrant from a Superior Court Judge. Mr. Soukup requested that he use exactly the same information which he used in obtaining the search warrant from the District Court Judge.

6. Detective Brownell complied with Mr. Soukup's request. The only information he added to the affidavit presented to Superior Court Judge Susan Hahn on October 9, 2013 was that there had been a search warrant granted on the same information earlier by a District Court Judge, and that he had been requested by the Prosecutor's Office to reapply for the warrant to a Superior Court Judge.

7. In seeking the October 2013 warrant the police used an affidavit for probable cause identical to the one used in September 2012.

8. Judge Hahn authorized the search warrant. Detective Brownell did not ask Verizon to send the records again.

9. On October 15, 2013, Detective Dunsmore faxed the new warrant to a different entity, "Verizon Legal Compliance" at a different phone number - (908) 306-7491.

10. The facsimile face page stated: "These records were requested by a district court warrant previously. Based on recent court ruling [sic]

17

they need to be based on a superior court warrant." No new records were ever provided under this warrant.

11. Shortly after the date of the crime Toppenish Police Department Detective Damien Dunsmore had sent a letter to Verizon Wireless requesting that any texts messages in their system at that time be "held" and not "purged." This letter is not a search warrant. It is simply a request to maintain the records that exist in Verizon's care.

12. Verizon Wireless records custodian Melissa Sandoval testified that the text message documents originally provided by Verizon pursuant to the search warrant obtained from the District Court Judge on September 25, 2012 were still being held as of the trial in this matter pursuant to Detective Dunsmore's preservation letter. Thus, said documents would have also been in Verizon Wireless's possession when Detective Brownell obtained the Superior Court search warrant on October 9, 2013.

13. The police did not try to get a warrant in the state where the records were retained.

14. RCW 10.96.020(2) provides that: "Criminal process issued under this section must contain the following language in bold type on the first page of the document: "This [warrant, subpoena, order] is issued pursuant to RCW [insert citation to this statute]. A response is due within twenty business days of receipt, unless a shorter time is stated herein, or the applicant consents to a recipient's request for additional time to comply." Neither warrant contained this language.

. . . .

## II. CONCLUSIONS OF LAW

1[.] The legislature has explicitly provided in RCW 10.96.060 that "[a] judge of the superior court may issue any criminal process to any recipient at any address, within or without the state, for any matter over which the court has criminal jurisdiction pursuant to RCW 9A.04.030." ([E]mphasis added). The crime in the present case is alleged to have been committed in Toppenish, Washington. Yakima County Superior Court has criminal jurisdiction over crimes committed in the State of Washington. Therefore, a Washington State Superior Court Judge was authorized to issue a search warrant for items located outside of the State in this case.

2. Once the search warrant is signed it is entitled to full faith and credit throughout the United States.

3. There is nothing that was requested based on the invalid district court warrant that tainted the second warrant. It was really nothing more than a technical error that was corrected.

18

4. The language from RCW 10.96.020(2) is mandatory. However, it is an instructional caution that goes to the recipient of the warrant and does not rise to the level of a defendant that would prevent the instruction the evidence that was the subject of the warrant.

CP at 215-18 (boldface omitted) (alterations in original).

## LAW AND ANALYSIS

On appeal, Ray Betancourth contends the trial court erred by denying his motion to suppress as evidence his statements during police interviews, by denying his motion to suppress as evidence the cell phone text messages, by allowing the State to argue in closing that he did not prove his defense to felony murder because of undisputed evidence that he drove Marco Cardenas to the scene of the shooting, by allowing the State during closing to repeatedly utter his text message of wanting to "beat the shit" out of Terrence Frank, and by imposing the extent of the legal financial obligations. These many assignments of error raise subissues and prolong this opinion. We address first whether the trial court committed error by permitting the State's comments, during closing argument, concerning the defense to felony murder.

Prosecution Closing Argument on Importune

*Issue 1: Whether the trial court erred when failing to sustain Ray Betancourth's objection to comments of the prosecutor during the closing statement that Ray Betancourth importuned the death of Jose Rodriguez by providing for the opportunity of the shooting?*

19

*Answer 1: Yes.*

Ray Betancourth raised the statutory defense to felony murder under RCW 9A.32.050. RCW 9A.32.050 creates the crime of second degree murder and reads, in relevant part:

> (1) A person is guilty of murder in the second degree when:
> (a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person; or
> (b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

RCW 9A.32.050(1)(b) denotes the crime of felony murder that occurs when the accused does not shoot the victim, but an accomplice, during the commission of another crime, shoots the victim. Ray Betancourth did not shoot Jose Rodriguez. A companion did.

In a prosecution for felony murder when a coparticipant, not the accused, shoots the victim, the accused may raise a defense of lack of knowledge of the coparticpant carrying a deadly weapon. The remainder of RCW 9A.32.050 reads:

> . . . except that in any prosecution under this subdivision (1)(b) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:
> (i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
> (ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

20

(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and
(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

We focus on RCW 9A.32.050(1)(b)(i), which subsection withdraws the defense if the accused solicited, requested, importuned, caused, or aided "the commission thereof." "Thereof" refers back to the "homicidal act," not the underlying felony. During closing arguments, the State argued that Ray Betancourth needed to prove that he did not "provide the opportunity" for the homicide. RP at 1451. The State declared: "Importune means provide the opportunity." RP at 1451. "He [Betancourth] provided the opportunity for the homicidal act, didn't he?" RP at 1451. "He brought Marcos to the scene where the shooting took place." RP at 1451. "So he gave him the opportunity." RP at 1451. "So you should deny it [the defense] on that basis alone." RP at 1451.

Contrary to the State's closing argument, the accused does not forfeit the defense under RCW 9A.32.050 by providing the gunman the opportunity to shoot. The word "opportunity" is not used in the statute. The State also erroneously declared that the word "importune" means give one an opportunity.

The Washington criminal code does not define the word "importune." We may use a dictionary to discern the plain meaning of an undefined statutory term. *Nissen v. Pierce County*, 183 Wn.2d 863, 881, 357 P.3d 45 (2015). "Importune" means in a lay dictionary:

21

> **1. a:** [T]o press or urge with frequent or unreasonable requests or troublesome persistence
> **2. b:** To make immoral or lewd advances toward

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1135 (1993). Thus, the State's summation conflicted with the law and with the court's instruction to the jury. The accused must take steps to cause the murder beyond merely providing the opportunity for the killing.

A prosecuting attorney commits misconduct by misstating the law. *State v. Allen*, 182 Wn.2d 364, 373-74, 341 P.3d 268 (2015); *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). Also, statements by the prosecution or defense to the jury on the law must be confined to the law as set forth in the instructions given by the court. *State v. Davenport*, 100 Wn.2d 757, 760, 675 P.2d 1213 (1984); *State v. Estill*, 80 Wn.2d 196, 199, 492 P.2d 1037 (1972).

*Issue 2: Whether Ray Betancourth's conviction for second degree murder should be reversed because of the erroneous argument of the prosecution?*

*Answer 2: Yes.*

A case will be reversed for improper argument of law by counsel when the error is prejudicial to the accused. *State v. Davenport*, 100 Wn.2d 757, 762 (1984). In determining whether a trial was fair and whether the defendant suffered prejudice, the court should look to the trial irregularity and determine whether it may have influenced the jury. *State v. Davenport*, 100 Wn.2d at 762. The prosecuting attorney misstating the

22

law of the case to the jury is a serious irregularity having the grave potential to mislead the jury. *State v. Davenport*, 100 Wn.2d at 763. Misstating the law on a key issue in the case is a factor showing prejudice. *State v. Allen*, 182 Wn.2d 364, 375 (2015). The trial court's overruling, in the presence of the jury, of the defendant's objection to the misstatement of the law is an important factor in weighing prejudice since the trial court's ruling lends an aura of legitimacy to the improper argument. *State v. Allen*, 182 Wn.2d at 378.

We hold the State's closing argument was prejudicial to Ray Betancourth. Betancourth testified to his lack of knowledge of Marco Cardenas possessing a gun. One of the State's prime witnesses, David Chavez, also denied having knowledge of Cardenas bringing a gun to the chase. Other testimony supported a finding that Betancourth should have reasonably concluded that Cardenas held a gun during the chase, but the jury could have rejected this testimony and found otherwise. Although there was some evidence that Betancourth possessed a gun inside the pickup truck, Betancourth did not take his firearm on the chase. A jury could infer from this evidence that Betancourth did not want or expect anyone else to bring a gun to the chase. The State's misstatement of the law was central to a key issue in the trial. The trial court impliedly approved the State's misinforming of the jury when the trial court overruled Betancourth's objections to the closing argument.

23

We reverse the second degree murder conviction of Ray Betancourth on the basis of the prosecution's misstatement of the law. Since a new trial is likely on the second degree murder charge, we should and do determine whether the trial court should have granted Ray Betancourth's motion to suppress statements made during the two police station interviews. This issue is also important in determining whether Betancourth's first degree assault charge should be reversed.

## Police Station Interviews

*Issue 3: Should the trial court have suppressed statements uttered by Ray Betancourth to police on September 21 or October 9, 2012?*

*Answer 3: No.*

Ray Betancourth contends the trial court erred in admitting his statements to police during the September 21 and October 9, 2012 interviews. He argues the statements are inadmissible because he made them during custodial interrogations without the police affording him *Miranda* warnings. The State responds that the trial court properly admitted Betancourth's statements because he was not in police custody when the police interviewed him. Additionally, the State maintains that any error in admitting the statements was harmless. We agree with the State that Betancourth was not in custody at the time of the interviews.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const.

24

amend. V. Article 1, section 9 of the Washington State Constitution declares, in part:

"No person shall be compelled in any criminal case to give evidence against himself. . . ."

Article 1, section 9 is equivalent to the United States Constitution's Fifth Amendment

and should receive the same interpretation. *State v. Templeton*, 148 Wn.2d 193, 207-08,

59 P.3d 632 (2002); *State v. Foster*, 91 Wn.2d 466, 473, 589 P.2d 789 (1979).

The right against testimonial compulsion is not limited to the courtroom. In

*Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 964 (1966), the

United States Supreme Court adopted prophylactic measures designed to protect a

suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial

interrogation. The *Miranda* Court held that a suspect interrogated while in police custody

must be told that he has a right to remain silent, that anything he says may be used

against him in court, and that he is entitled to the presence of an attorney, either retained

or appointed, at the interrogation. *Miranda v. Arizona*, 384 U.S. at 444; *Maryland v.

Shatzer*, 559 U.S. 98, 104, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010). Without *Miranda*

warnings, a suspect's statements during custodial interrogation are presumed involuntary

and are thus inadmissible. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004).

The United States Supreme Court formulated *Miranda* warnings to protect a

defendant's constitutional right not to make incriminating confessions or admissions to

police while in the coercive environment of police custody. *Miranda v. Arizona*, 384

U.S. at 468-69 (1966); *State v. Heritage*, 152 Wn.2d at 214. Washington courts have

25

enunciated two rationales for recognizing a custodial situation requiring *Miranda* warnings: (1) to protect the individual from the potentiality of compulsion or coercion inherent in in-custody interrogation, and (2) to protect the individual from deceptive practices of the interrogation. *Heinemann v. Whitman County*, 105 Wn.2d 796, 806, 718 P.2d 789 (1986). Conversely, the requirement is not intended to unduly interfere with a proper system of law enforcement or to hamper the traditional investigatory and public safety functions of the police. *Miranda v. Arizona*, 384 U.S. at 481.

Law enforcement officers need not deliver the *Miranda* warnings whenever speaking with a citizen, let alone questioning a prime suspect of a crime. For statements to be later admissible, *Miranda* warnings must precede the statements made during (1) custodial (2) interrogation (3) by an agent of the State. *State v. Heritage*, 152 Wn.2d at 214.

The State concedes that its agents conducted the questioning of Ray Betancourth. The State also presents no argument on whether the police questioning constituted interrogation. "Interrogation" can be express questioning or any words or actions reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 292, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 685, 327 P.3d 660 (2014). In both police station encounters, officers directly questioned Ray Betancourth about his involvement in a murder. Detective Jaban Brownell testified, at a suppression hearing, that he sought to elicit from Betancourth

26

information about the murder. We conclude that Toppenish law enforcement officers interrogated Betancourth. The issue becomes whether the trial court correctly ruled that Betancourth was not "in custody" during the station interviews.

The United States Supreme Court declared, in *Miranda v. Arizona*, that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444 (1966). The police are required to give *Miranda* warnings only when "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. at 495.

The United States Supreme Court has given some guidance as to factors that, standing alone, do not merit a finding of custody. "[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Oregon v. Mathiason*, 429 U.S. at 495. Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law

27

enforcement system that may ultimately cause the suspect to be charged with a crime. *Oregon v. Mathiason*, 429 U.S. at 495. There is coercion and there is coercion. A small degree of coercion is permissible. A large degree of coercion is not permissible. Lower courts must adjudge the dividing line between the two.

Similarly *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. at 495. The high court has rejected the notion that the "in custody" requirement is satisfied merely because the police interviewed a person who was the "focus" of a criminal investigation. *Beckwith v. United States*, 425 U.S. 341, 347, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976).

A key aspect of the custodial setting as described in *Miranda* is the isolation of the suspect in a room that is dominated by law enforcement officials. *State v. Pejsa*, 75 Wn. App. 139, 147, 876 P.2d 963 (1994). Whether officers told the suspect he was free to leave is also a significant factor in the custody analysis. *State v. D.R.*, 84 Wn. App. 832, 838, 930 P.2d 350 (1997). A court may consider age in the custody analysis so long as the suspect's age was known to the officer at the time of police questioning or would have been objectively apparent to a reasonable officer. *J.D.B. v. North Carolina*, 564 U.S. 261, 274, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011).

The test of whether police engage in a custodial interrogation is an objective test. *J.D.B. v. North Carolina*, 564 U.S. at 270. We do not consider whether the accused

subjectively considered himself restrained or free to depart the presence of law enforcement or whether the officers considered the accused free to leave or under implied arrest. Instead we consider whether the mythical reasonable person would consider himself restrained and hope that judges unaccustomed to being the target of a law enforcement investigation can discern what a reasonable person would think.

A person is in custody, for purposes of *Miranda* warnings, when "a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." *State v. Heritage*, 152 Wn.2d at 218 (2004). It thus is irrelevant whether the police had probable cause to arrest the defendant, whether the defendant was a "focus" of the police investigation, whether the officer subjectively believed the suspect was or was not in custody, or even whether the defendant was or was not psychologically intimidated. *State v. D.R.*, 84 Wn. App. at 836 (1997). The critical inquiry is not the psychological state of the defendant but whether his freedom of movement is restricted. *State v. Sargent*, 111 Wn.2d 641, 649, 762 P.2d 1127 (1988). The circumstances of each case must influence a determination of whether a suspect is "in custody" for purposes of receiving of *Miranda* protection. *California v. Beheler*, 463 U.S. at 1125 (1983).

Ray Betancourth argues that both encounters in the Toppenish detectives' trailer satisfied the custodial prong of the *Miranda* analysis because a reasonable person of similar age would not have felt free to leave. The State argues the trial court decided

29

correctly because Betancourth was never told that he could not leave, the officers never threatened him, and Betancourth voluntarily went to the police station and talked to the police. We consider the elements emphasized by the State to be critical and agree with the State's position.

The facts of some United States Supreme Court and Washington appellate court decisions assist us. In *Oregon v. Mathiason*, 429 U.S. 492 (1977), the Supreme Court held that the defendant was not in custody when questioned about his involvement by a detective at an office in the state patrol station. The suspect willingly went to the station to discuss the burglary, met the officer in the hallway, shook hands, and went into an office. The officer told the suspect he was not under arrest. The two sat across a desk with the door closed when the officer began questioning the suspect about his involvement in the burglary. Within five minutes of entering the office, the suspect confessed and then received his *Miranda* warnings. The Supreme Court found he was not subject to custodial interrogation because "there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way." *Oregon v. Mathiason*, 429 U.S. at 495.

In *California v. Beheler*, 463 U.S. 1121 (1983), Jerry Beheler admitted his involvement in a fatal shooting. He was at the police station when he made the incriminating statements. Although he was not given his *Miranda* warnings, the police told Beheler that he was not under arrest. The Supreme Court reversed the California

30

Court of Appeals, holding that *Miranda* warnings were not required.

In *State v. Furman*, 122 Wn.2d 440, 858 P.2d 1092 (1993), law enforcement took Michael Furman's confession to murder without reading him *Miranda* warnings. Furman was seventeen years old at the time. The Supreme Court refused to suppress the confession because Furman was free to leave during the confession.

In *State v. Grogan*, 147 Wn. App. 511, 195 P.3d 1017 (2008), *review granted*, 168 Wn.2d 1039, 234 P.3d 169 (2010), Clifford Grogan voluntarily went to the Spokane Public Safety Building to talk to officers about a murder investigation. He was not placed under formal arrest. He was told that he could leave at any time and he acknowledged that he was told he could leave at any time. The interviewing detectives did not give *Miranda* warnings. This court affirmed the trial court's refusal to suppress the statements given during the interview.

Ray Betancourth suggests his case is similar to *State v. Daniels*, 160 Wn.2d 256, 156 P.3d 905 (2007). In *Daniels*, the police suspected the defendant committed homicide by abuse for the death of her nine-week-old son. The day after her son's funeral, two police detectives questioned seventeen-year-old Carissa Daniels for over 90 minutes in an 8 foot by 10 foot room at the precinct. The detectives refused to allow her father to accompany her. They did not give her any *Miranda* warnings until near the end of the interrogation, she refused to answer any more questions soon after receiving the warnings, and then they placed her in a holding cell. Our Supreme Court found the

detectives subjected Daniels to a custodial interrogation and affirmed suppression of her statements. Unfortunately, the decision provides little insight into what factors are important or controlling when determining the status of custody.

We deem other decisions more analogous than *State v. Daniels*. In *Daniels*, the record shows no comments to the accused that she was not under arrest or that she could leave at any time. The interrogation took place the day after the son's funeral, while Carissa Daniels suffered stress. Ray Betancourth suffered no similar stress. Daniels was seventeen years old, while Betancourth was eighteen years of age. Although the difference in age is only one year, society considers an eighteen-year-old to be the age of majority and capable of living on one's own. Although both interviewing rooms were small, the Toppenish trailer was double the size of the precinct room in *Daniels*. Betancourth understood he was free to leave, and he left on his own volition both times.

Ray Betancourth emphasizes his age. Ray Betancourth was eighteen at the time of the killing and the police station questioning. In *J.D.B. v. North Carolina*, 564 U.S. at 272, the United States Supreme Court held that the age of a child subjected to police questioning is relevant to the custody analysis of *Miranda v. Arizona*. The court reasoned that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave. The Supreme Court did not announce, however, the dividing line between an adult and a child. The petitioner, J.D.B., was thirteen years old when he was removed from his classroom by a uniformed police

32

officer, escorted to a closed-door conference room, and questioned by two police officers with two school administrators present and encouraging him to speak. Even then, the Supreme Court did not suppress the confession, but remanded the case for the lower court to consider age as one factor in the determination of whether J.D.B. was in custody.

Toppenish police officers' denial of entry of Ray Betancourth's parents into the investigations office plays in favor of Betancourth. Nevertheless, we do not find this factor controlling. The *Daniels* court considered this factor, but did not rule it controlling. We find no case in which a court holds that the barring of a parent from the interview should require police to give a child *Miranda* warnings. Although not directly on point, the following decisions hold that a child's statement without a parent present constituted a voluntary statement. *State v. Moore*, 2015 WI 54, 363 Wis. 2d 376, 864 N.W.2d 827 (2015); *People v. Edwards*, 2015 IL App (3d) 130190, 32 N.E.3d 116, 392 Ill. Dec 116, *leave to appeal filed*, No. 119332 (Ill. 2015); *State v. Moses*, 390 S.C. 502, 702 S.E.2d 395 (Ct. App. 2010); *Smith v. State*, 276 Ga. 97, 575 S.E.2d 450 (2003).

The record does not show that law enforcement told Ray Betancourth, during the October 9 interview, that he was free to leave. Nevertheless, Detective Officer Jaban Brownell told Betancourth such during the September 21 questioning and there was little difference between the two interviews. The September 21 and October 9 interviews shared location, participants, and duration. No officer told Betancourth he was under arrest during the second interview. Betancourth left when he wanted.

33

Ray Betancourth assigns error to many of the trial court's findings of fact, but most of alleged errors concern findings addressing whether Betancourth was in custody during the law enforcement interviews. Two discrete inquiries are essential to the determination of custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). Once the trial court reconstructs the play and determines the stage props, the actors' positions and movements on stage, and the elocution and dialogue of the actors, the reviewing court applies an objective test to resolve the ultimate inquiry of whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Regardless of whether the status of being in custody is referred to as a finding of fact or a conclusion of law, we review the determination de novo because of its legal significance. *Thompson v. Keohane*, 516 U.S. at 121; *State v. Daniels*, 160 Wn.2d at 261 (2007). Still, we agree with the trial court's determination of the lack of custody.

Ray Betancourth assigns error to finding of fact 1.7, which reads:

> . . . The defendant testified that he got along fine with [Detectives] Brownell and Dunsmore, but claims that he was nervous and felt intimidated by [Sergeant] Logan. The court does not find this claim credible. As he testified the defendant presented as being very confident in a potentially stressful situation.

34

CP at 105. This finding is one of pure fact unencumbered by legal consequences. If the accused challenges findings of fact, they are verities if supported by substantial evidence in the record. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. *State v. Cherry*, 191 Wn. App. 456, 464, 362 P.3d 313 (2015). Substantial evidence supports the trial court's finding of fact 17.

### Verizon Text Messages

We now address Ray Betancourth's remaining contentions to determine whether he is entitled to relief from his conviction for first degree assault. Betancourth contends that the trial court erred by admitting as evidence cell phone records from Verizon in the form of text messages because the police obtained the records without a valid search warrant and that this error requires reversal. He argues that the Yakima County District Court warrant was not valid. He also contends that the superior court warrant was defective because it did not include language requiring a response within twenty days. He further observes that Verizon produced no text messages in response to the superior court warrant. Alternatively, he challenges the constitutional validity of the warrant statute, RCW 10.96.060.

The State responds that the records are admissible through the superior court warrant, under the independent source doctrine. Any failure to retrieve another copy of the text messages after service of the superior court warrant was a technicality that does

not preclude use of the messages as evidence. The State also maintains that RCW

10.96.060 is constitutional. In turn, Ray Betancourth contends the State may not raise the

independent source doctrine on appeal because the trial court did not rely on the doctrine.

The State also argues that, assuming the trial court should have excluded the cell phone

records, their use as evidence at trial is harmless error.

*Issue 4: Whether the Verizon text messages should have been suppressed because*

*the superior court search warrant lacked language that the recipient needed to respond*

*within twenty days?*

*Answer 4: No. The lack of statutory language is a ministerial error that does not*

*invalidate the warrant.*

On September 25, 2012, the Yakima County District Court issued a search warrant

ordering Verizon Wireless to provide Ray Betancourth's cell phone records from

September 19 to September 25, 2012. Detective Damon Dunsmore faxed the warrant to

Verizon's custodian of records in New Jersey, and Verizon sent the phone records to

Dunsmore. The State concedes that the district court warrant was invalid since RCW

10.96.060 demands a search warrant served outside Washington State be issued by a

superior court. RCW 10.96.060 provides in part:

> A judge of the *superior court* may issue any criminal process to any
> recipient at any address, within or without the state, for any matter over
> which the court has criminal jurisdiction pursuant to RCW 9A.04.030.

A search warrant is a criminal process. RCW 10.96.010(3). One absolutely

36

necessary component of a valid warrant is that it be issued by a magistrate with the legal

authority to issue it. *City of Seattle v. McCready*, 123 Wn.2d 260, 272, 868 P.2d 134

(1994).

The State argues that the issuance of the superior court search warrant on October

9, 2013, suffices to authorize use of the text messages at trial. Law enforcement sent the

superior court warrant also to Verizon. We thus address the effect of the search warrant's

failure to contain language declaring that a response to the warrant is due within twenty

days.

RCW 10.96.020 reads:

> **Production of records.**
> This section shall apply to any criminal process allowing for search of or commanding production of records that are in the actual or constructive possession of a recipient who receives service outside Washington, regardless of whether the recipient or the records are physically located within the state.
> (1) When properly served with criminal process issued under this section, the recipient shall provide the applicant all records sought pursuant to the criminal process. The records shall be produced within twenty business days of receipt of the criminal process, unless the process requires earlier production. An applicant may consent to a recipient's request for additional time to comply with the criminal process.
> (2) *Criminal process issued under this section must contain the following language in bold type on the first page of the document: "This [warrant, subpoena, order] is issued pursuant to RCW [insert citation to this statute]. A response is due within twenty business days of receipt, unless a shorter time is stated herein, or the applicant consents to a recipient's request for additional time to comply."*

37

(Emphasis added.) The superior court search warrant directed to Verizon did not contain the language demanded under RCW 10.96.020(2).

We already addressed Ray Betancourth's assignment of error concerning the missing language in a search warrant in *State v. Blizzard*, 195 Wn. App. 717, 730, 381 P.3d 1241 (2016). The *Blizzard* search warrant also lacked the same statutorily mandated language. We refused to suppress evidence obtained under the warrant. We observed that, absent constitutional considerations, the rules for execution and return of a warrant are essentially ministerial in nature. *State v. Blizzard*, 195 Wn. App. at 730; *State v. Kern*, 81 Wn. App. 308, 311, 914 P.2d 114 (1996). In general, procedural noncompliance with the rules does not invalidate a warrant or otherwise require suppression of evidence absent a showing of prejudice to the defendant. *State v. Parker*, 28 Wn. App. 425, 426-27, 626 P.2d 508 (1981).

Ray Betancourth shows no prejudice by the missing language in the search warrant of Verizon records. Verizon proffered the text messages within twenty days of the warrant being faxed to it. It actually produced the records before the service of the warrant. The parties would have acted no differently had the language been contained within the search warrant. The purpose of requiring the language in the search warrant is to warn the recipient of the warrant of the deadline for a response. The purpose of the language is not to protect the rights of the accused.

38

Ray Betancourth may contend that, because the district court search warrant was invalid, the superior court warrant was also invalid. Betancourth may or may not be arguing that the invalid warrant somehow assisted law enforcement in obtaining the superior court warrant such that the search warrant is tantamount to fruit of the poisonous tree. Betancourth supplies no legal authority for this narrow argument. Law enforcement did not gain any information from the records supplied in response to the first warrant that led it to seek the superior court warrant. The purpose of the superior court warrant was to correct the invalidity of the district court warrant. Even without information gathered from Verizon in response to the district court warrant, probable cause supported issuance of the superior court warrant.

*Issue 5: Whether RCW 10.96.060's provision allowing the subpoena of records in a foreign state conflicts with other Washington statutes and therefore is invalid?*

*Answer 5: No.*

In order to defeat the superior court warrant, Ray Betancourth next contends that RCW 10.96.060 conflicts with two statutes, RCW 2.08.190 and 2.08.210. We disagree.

RCW 2.08.190 declares:

> **Powers of judge in counties of his or her district.**
> Any judge of the superior court of the state of Washington shall have power, in any county within his or her district: (1) To sign all necessary orders and papers in probate matters pending in any other county in his or her district; (2) to issue restraining orders, and to sign the necessary orders of continuance in actions or proceedings pending in any other county in his or her district; (3) to decide and rule upon all motions, demurrers, issues of

fact, or other matters that may have been submitted to him or her in any other county. All such rulings and decisions shall be in writing and shall be filed immediately with the clerk of the proper county: PROVIDED, That nothing herein contained shall authorize the judge to hear any matter outside of the county wherein the cause or proceeding is pending, except by consent of the parties.

This statute addresses the situation where one judge sits in a bi-county judicial district. The judge may sign orders and entertain motions, while physically present in one county, that impact parties and cases in another county. The statute imposes no restriction on a superior court judge for issuing subpoenas in cases pending in his county that seek records stored in another county or state.

RCW 2.08.210 reads:

**Extent of court's process—Venue.**
The process of the superior courts shall extend to all parts of the state. . . .

The statute extends a superior court judge's authority for process throughout the state, but the statute does not limit the authority at the state's border. More importantly, Ray Betancourth presents no argument as to how, assuming RCW 2.08.210 impliedly constricts the superior court's authority, any conflict between RCW 10.96.060 and RCW 2.08.210 should be resolved. To repeat, the former statute reads:

A judge of the *superior court* may issue any criminal process to any recipient at any address, within or without the state, for any matter over which the court has criminal jurisdiction pursuant to RCW 9A.04.030. . . .

40

RCW 10.96.060 expressly gives authority to issue process outside the state of Washington. To the extent two laws conflict, we give precedence to the more specific law, which here is RCW 10.96.060. *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 309, 197 P.3d 1153 (2008).

*Issue 6: Whether this reviewing court should address the State's contention that the independent source doctrine permits introduction of the Verizon text messages?*

*Answer 6: Yes.*

The State seeks to defend use of the Verizon text messages, despite the failure to produce the records a second time pursuant to the superior court warrant, on the basis of the independent source doctrine. Before we address the merits of the argument, Ray Betancourth seeks to preclude employment of the argument on appeal on the basis that the trial court did not rest its decision on the independent source doctrine or enter findings affirming that the doctrine applied.

We are not sure whether the trial court rested its ruling, in part, on the independent source doctrine. The court ruled that the search warrant was entitled to full faith and credit throughout the nation, despite signed by a district court judge. The State does not assert a full faith and credit argument on appeal. The trial court also ruled, however, that the later superior court warrant corrected a technical error and that the invalid district court warrant did not taint the superior court warrant. This language suggests that the trial court may have based its ruling, in part, on the independent source doctrine.

41

Regardless of whether the trial court grounded its decision in part in the independent source doctrine, the State may still employ the doctrine, and we may rely on the doctrine on appeal. The State raised the argument below. An appellate court may affirm a trial court's decision on any theory supported by the record and the law even if the trial court did not rely on the theory. *State v. Glenn*, 140 Wn. App. 627, 636, 166 P.3d 1235 (2007); *State v. Bradley*, 105 Wn. App. 30, 38, 18 P.3d 602, 27 P.3d 613 (2001). We discern no rule that requires the trial court to have entered findings supporting the application of the doctrine, in order for us to review the doctrine's application, as long as the application is consistent with other findings and supported by the evidence.

*Issue 7: Whether the independent source doctrine permitted introduction of the Verizon text messages as evidence?*

*Answer 7: No. Nevertheless, a corollary of the independent source doctrine allowed introduction of the text messages. Evidence seized through an invalid search warrant need not be returned and reseized once the State garners a later valid search warrant as long as the invalid warrant does not taint the valid warrant.*

The State seeks to justify the admission of the Verizon cell phone text messages on the basis of the independent source doctrine. Washington State and United States courts have long recognized the independent source exception. *Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988); *State v. Gaines*, 154

Wn.2d 711, 717, 116 P.3d 993 (2005). The doctrine presents an exception to the rule that evidence obtained in violation of the privacy protections of the Fourth Amendment or article I, section 7 of the state constitution must be excluded. *State v. Ruem*, 179 Wn.2d 195, 208-09, 313 P.3d 1156 (2013).

Under the independent source exception, evidence tainted by unlawful governmental action is not subject to suppression under the exclusionary rule, provided that law enforcement ultimately obtained the evidence pursuant to a valid warrant or other lawful means independent of the unlawful action. *State v. Gaines*, 154 Wn.2d at 718. Washington courts consider the independent source doctrine to be based on logic. *State v. Gaines*, 154 Wn.2d at 718. According to the plain text of article I, section 7, a search or seizure is improper only if it is executed without "authority of law." But a lawfully issued search warrant provides such authority. *State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999).

We conclude the independent source doctrine, under its stated terms, does not apply in this appeal. The doctrine assumes that the State eventually procures the evidence pursuant to a valid warrant untainted by evidence unlawfully acquired. Toppenish law enforcement officers never obtained the text messages pursuant to a valid warrant. The messages arrived only in response to an invalid warrant.

The State still argues that the independent source doctrine applies based on a federal ruling, *United States v. Herrold*, 962 F.2d 1131 (3d Cir. 1992). We agree to apply

*Herrold* but we read *Herrold* as adopting a corollary to the independent source doctrine, which corollary we christen the invalidity correction corollary.

In *United States v. Herrold*, law enforcement used an informant to purchase cocaine from Gene Herrold. Officers monitored the purchase. Because the officers observed Herrold retrieve the cocaine from his home, the officers garnered probable cause to obtain a search warrant for Herrold's residence. Nevertheless, the informant told officers that Herrold would soon leave his house for the purpose of selling cocaine elsewhere, and officers worried that Herrold would leave with or destroy all of the evidence before they could secure a warrant. Trooper Hill knocked on the door of Herrold's residence. Herrold answered the door, and, when Hill told Herrold that he was under arrest, Herrold attempted to shut the front door. Hill forced his entry into the home, and other officers followed. Hill arrested Herrold. Hill and others noticed cocaine, drug paraphernalia, and a pistol inside. While Trooper Hill swore an affidavit and collected a search warrant for the home, other officers stood guard inside the home. The search warrant allowed the seizure of all drugs and firearms on the premises. Once law enforcement garnered the warrant, officers searched the home and seized drugs and paraphernalia, some of which officers previously spotted on first entering the home. The facts from the trial court do not disclose whether the officers seized the pistol before the procurement of the search warrant, but the reviewing court assumed that officers grabbed and held the pistol for security reasons. The government charged Gene Herrold, a

44

previous felon, with unlawful possession of a firearm and using a firearm during a drug

trafficking offense.

In *United States v. Herrold*, the trial court suppressed the gun, all cocaine, and all

drug paraphernalia on the basis that the warrantless entry of Gene Herrold's home

violated the Fourth Amendment. According to the trial court, this violation tainted the

later search pursuant to the search warrant.

In *United States v. Herrold*, the Circuit Court of Appeals reversed the trial court's

suppression of evidence. The appellate court noted that law enforcement officers did not

seize the cocaine or drug paraphernalia until after procuring the search warrant and that

officers had probable cause to search the house without knowledge gained by unlawfully

entering the premises. Therefore, the independent source doctrine applied and saved the

evidence for use at trial.

The Circuit Court of Appeals, in *United States v. Herrold*, isolated the pistol for

discrete analysis as to its admissibility as evidence. Again, the court assumed that the

officers seized the firearm on initial entry into the home, did not return the pistol to Gene

Herrold's possession while seeking a search warrant, and then reseize it on obtaining the

warrant. The court wrote:

> We recognize, of course, that this case presents a special question
> with regard to the gun because the police actually seized it during the
> unlawful entry and not during the warranted search. Nevertheless, we see
> no reason not to treat the gun as also being seized pursuant to the search
> warrant which specifically authorized the seizure of "firearms of any type."

The Supreme Court in *Murray* rejected the argument that objects "once seized cannot be cleanly reseized without returning the objects to private control," 487 U.S. at 541-42, 108 S. Ct. at 2535 (quoting *United States v. Silvestri*, 787 F.2d [736, 739 (1st Cir. 1986)]), and stated that under the independent source doctrine "reseizure of tangible evidence already seized" is permissible "[s]o long as the later, lawful seizure is genuinely independent of an earlier tainted one." *Id.* It would be dangerous to require officers to leave a fully-loaded, semi-automatic weapon unsecured until they obtained a warrant, and senseless to require the formality of physically re-seizing the gun already seized during the initial entry. Thus, the only logical implication under *Murray* is that the gun is as admissible under the independent source doctrine as the other, non-dangerous evidence, seen during the initial entry but not seized until the warrant-authorized search.

*United States v. Herrold*, 962 F.2d at 1143 (3d Cir. 1992).

Our case on appeal has factors distinguishing it from *United States v. Herrold*. The initial seizure of the text messages was not pursuant to a warrantless entry of a home and not in violation of the state or federal constitution. Instead, the gathering of the text messages violated a state statute, a distinction lending itself to denying Ray Betancourth's motion to suppress the evidence. The initial seizure was not for the purpose of officer safety or to preserve evidence, a distinction lending itself to granting Betancourth's motion. Nevertheless, as in *Herrold*, it would be senseless to demand that Toppenish law enforcement require Verizon to send another copy of the text messages already forwarded once by Verizon. Therefore, we hold that the trial court did not err when refusing to suppress the text messages.

We recognize that the Washington Supreme Court has not addressed the invalidity correction corollary. We conclude, however, that our state Supreme Court would adopt

46

this corollary because of the illogic of requiring evidence to be produced a second time once law enforcement procures a valid warrant and the first warrant did not contaminate the latter warrant.

Remember that Ray Betancourth protests that the trial court did not deny his motion to suppress on the basis of the independent source doctrine. We note that the trial court's ruling, however, is grounded on the same reasoning we employ. Requiring a second production of the text messages is overly technical.

*Issue 8: Whether RCW 10.96.020 violates the due process clause?*

*Answer 8: No.*

Pursuant to teaching, we have so far avoided the constitutional question surrounding RCW 10.96.020 raised by Ray Betancourth and instead sought to resolve the appeal concerning the search warrant for text messages on other grounds. *Isla Verde International Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 752, 49 P.3d 867 (2002). Because we find no other basis on which to reverse the trial court's denial of the motion to suppress the messages, we now face the constitutional issue.

Ray Betancourth notes that Toppenish officers sent the search warrant for the cellphone text messages first to a Verizon office in New Jersey and later to a Verizon office in Texas. Betancourth submits that there is no constitutional authority for one state court to subject citizens of another state to its laws on search and seizure. He questions the ability of a statute to authorize a superior court in Washington to issue search

47

warrants for execution in other states. In essence, Betancourth requests that we declare RCW 10.96.020 unconstitutional.

Ray Betancourth relies on *State v. Jacob*, 185 Ohio App. 3d 408, 2009-Ohio-7048, 924 N.E.2d 410. In that case, the State of Ohio charged Kevin Jacob, a resident of California, with theft from an elderly person when Jacob agreed to sell figurines for the victim on the Internet. Police in Ohio obtained a search warrant from the local court to search a residence in California. A member of the San Francisco Police Department executed the warrant, and the search led to the discovery of evidence that connected Jacob to the offense in Ohio. Later, police obtained another search warrant for electronic devices that had been seized at Jacob's home and transferred to Ohio. Jacob challenged the validity of the California search on the ground that the warrant was unlawfully executed in California. The Ohio Court of Appeals concluded that the search warrant violated Jacob's Fourth Amendment rights. *Jacob* holds that one state court should not subject citizens of another state to its laws on search and seizure.

*Jacob* may be distinguished from our case on appeal because the *Jacob* search warrant authorized the search of a residence in another state. The Yakima County search warrant sought copies of text messages that were sent entirely within the state of Washington and by a cellphone still located in Washington State. Toppenish officers sent the warrant to New Jersey because the cell phone company's custodian of records officed in the Garden State not for the purpose of seizing evidence with no situs in Washington.

48

We generally do not rely on unpublished opinions from other states, but, because of a dearth of relevant law and because Ray Betancourth relies on a recent Ohio decision, we decide to discuss a Michigan unpublished opinion that distinguishes itself from *State v. Jacob*. *People v. Wilson*, No. 300274 (Mich. Ct. App. May 30, 2013), http://publicdocs.courts.mi.gov/opinions/final/coa/20130530_c300274_68_300274.opn. pdf. We note that Mich. Ct. R 7.215(C)(1) allows citation of unpublished Michigan opinions, in Michigan courts, if the citing party explains the reason for citing it and how the decision relates to the issues presented.

In *People v. Wilson*, Sokol Gojcaj argued that his attorney was ineffective for not moving to suppress telephone records obtained pursuant to two Michigan search warrants served on Gojcaj's cell phone carrier at the carrier's Texas office. Gojcaj contended that the telephone records should have been suppressed because the magistrate who issued the two search warrants lacked jurisdiction to issue warrants pertaining to an out-of-state party. The reviewing court disagreed because the evidence obtained from the carrier in Texas involved only records of electronic communications that occurred in Michigan, not Texas. Even though the warrants were served on a party at its office outside the state, they solely concerned transactions that occurred within this state.

A statute is presumed to be constitutional, and the burden is on the party challenging the statute to prove its unconstitutionality beyond a reasonable doubt. *State v. Myles*, 127 Wn.2d 807, 812, 903 P.2d 979 (1995); *Aetna Life Insurance Co. v.*

49

*Washington Life and Disability Insurance Guaranty Association*, 83 Wn.2d 523, 528, 520

P.2d 162 (1974). We do not consider RCW 10.96.020 unconstitutional beyond a

reasonable doubt. We accept the reasoning behind *People v. Wilson* and hold that the

Yakima County Superior Court had authority to subpoena cellphone records from a

phone located in Washington State even though the office of the custodian of the records

rested in New Jersey.

State's Closing Argument—Repeat of Text Messages

*Issue 9: Whether this reviewing court should entertain Ray Betancourth's*

*contention that the prosecutor committed misconduct by repeatedly reminding the jury*

*that Betancourth stated he wanted to "beat the shit" out of others, when Betancourth's*

*counsel did not object to the prosecutor's comments during trial?*

*Answer 9: Yes, but Betancourth carries a higher burden to show misconduct*

*because of the failure of his trial counsel to object.*

The prosecution uttered the phrase, or a variation of the phrase, "beat the shit out

of" thirty-eight times during closing arguments. The prosecution lifted the phrase from

Ray Betancourth's text messages and Betancourth's remarks to friends David Chavez and

Mario Cervantes. Betancourth argues that the prosecution repeated the phrase in order to

inflame the passions and prejudice of the jury. Nevertheless, Betancourth never objected

at trial to the State's repeated use of the phrase. The State responds that Betancourth

waived the issue of prosecutorial misconduct because he did not object during the closing arguments.

Washington courts repeatedly declare that the failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011); *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994); *State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991). This rule assumes that the accused may assign error to the prosecution's closing remarks for the first time on appeal.

*Issue 10: Whether the prosecution's repeated reading of text messages during closing argument requires reversal of the first degree assault conviction?*

*Answer 10: No.*

When improper argument is charged, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments as well as their prejudicial effect. *State v. Hoffman*, 116 Wn.2d at 93. Reversal is not required if the error could have been obviated by a curative instruction that the defense did not request. *State v. Hoffman*, 116 Wn.2d at 93. The failure to object to a prosecuting attorney's improper remark constitutes a waiver of such error unless the remark is deemed to be so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *State v. Hoffman*, 116 Wn.2d at 93.

51

If trial counsel had objected early to the repeated uttering of Ray Betancourth's threats, the trial court could have ordered the State to refrain from repeating the phrase. Regardless of whether the remarks were flagrant or ill-intentioned, a timely objection could have prevented any prejudice if granted.

*Issue 11: Whether defense counsel was ineffective for failure to object to the prosecutor's improper remarks in closing arguments?*

*Answer 11: No.*

Ray Betancourth contends his trial counsel was ineffective because he failed to object to the prosecutor's improper statements during closing arguments. The State responds that Betancourth's trial counsel did not perform deficiently because the trial court would have properly denied any objection to the prosecutor's closing arguments. We hold that Betancourth's trial counsel did not perform deficiently.

To prevail on an ineffective assistance claim, a defendant must show his attorney was not functioning as guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thiefault*, 160 Wn.2d 409, 414, 158 P.3d 580 (2007). A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *State v. Thomas*, 109 Wn.2d 222, 225, 743 P.2d 816 (1987). If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). We presume that counsel was

52

effective. *Strickland v. Washington*, 466 U.S. at 689-90; *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). The burden is on Ray Betancourth to show deficient performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To rebut the strong presumption that counsel's performance was effective, Betancourth must establish the absence of any conceivable legitimate tactic explaining counsel's failure to object to the State's repeated use of the phrase "beat the shit out of" during closings. *State v. Hamilton*, 179 Wn. App. 870, 879-80, 320 P.3d 142 (2014). To rebut this presumption, Betancourth must demonstrate trial counsel's failure to object could not be characterized as a legitimate trial strategy or tactic. *State v. Grier*, 171 Wn.2d at 33. Where counsel's alleged error is failure to object to evidence, the defendant must show that the objection would have been sustained. *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

Ray Betancourth's trial counsel did not perform deficiently. Betancourth admits that mentioning the phrase a few times would be acceptable. Betancourth argues that the State's repeated use of the phrase was improper, but does not identify when trial counsel should have objected. He does not indicate how many times was too many times. We agree with the State that we cannot decipher when and even whether the trial court would have affirmed an objection to the use of the phrase because the State was quoting from

53

evidence in the record. The decision whether to object is a classic example of trial tactics and only in egregious circumstances will the failure to object constitute ineffective assistance of counsel. *State v. Kolesnik*, 146 Wn. App. 790, 801, 192 P.3d 937 (2008).

## Sentence

Ray Betancourth contends that the trial court erred by imposing discretionary legal financial obligations and imposing a mandatory DNA (deoxyribonucleic acid) collection fee. Because we vacate the conviction for second degree murder and remand for a new trial, we also vacate Betancourth's sentence. Upon a new trial or any dismissal of the charge of second degree murder, the trial court should resentence Betancourth.

## State Motion to Consolidate

The State moves to consolidate this appeal with Ray Betancourth's appeal No. 33954-8. In that appeal, Betancourth challenges the trial court's denial of his motion for a new trial. The State argues that consolidation may aid our review by providing additional insights and evidence from the trial court. We deny the motion to consolidate.

## CONCLUSION

We reverse the conviction of Ray Betancourth for second degree murder and remand the case for a new trial on this charge. We deny Betancourth's request to preclude use of his statements uttered during his two police station interviews and to exclude text messages subpoenaed from Verizon. We affirm Betancourth's conviction for first degree assault.

54

No. 32683-7-III
*State v. Betancourth*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, C.J.

WE CONCUR:

Siddoway, J.

Pennell, J.

55